# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued May 13, 2008          Decided June 27, 2008

No. 07-7067

JAMES A. THOMPSON, JR.,
APPELLANT

v.

DISTRICT OF COLUMBIA, ET AL.,
APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(No. 97cv01015)

———

*S. Micah Salb* argued the cause and filed the briefs for appellant.

*William J. Earl*, Senior Assistant Attorney General, Office of the Attorney General for the District of Columbia, argued the cause for appellee. With him on the brief were *Peter J. Nickles*, Interim Attorney General, *Todd S. Kim*, Solicitor General, and *Donna M. Murasky*, Deputy Solicitor General.

Before: GINSBURG, BROWN and KAVANAUGH, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* BROWN.

BROWN, *Circuit Judge*: James A. Thompson, Jr., appeals the dismissal of his claims that the District of Columbia retaliated against him for exercising his First Amendment rights and fired him without affording him due process. We affirm the district court's conclusion that the First Amendment did not protect Thompson's speech, but reverse its holding that Thompson had no right to due process.

I

Because the district court granted the District of Columbia's motion for judgment on the pleadings, we review its decision *de novo*, accepting as true all the allegations in Thompson's complaint. *See Peters v. Nat'l R.R. Passenger Corp.*, 966 F.2d 1483, 1485 (D.C. Cir. 1992).

Thompson, while employed as Chief of Security for the District of Columbia Lottery and Charitable Games Control Board ("Lottery Board"), began investigating misconduct by the Lottery Board and some of its contractors. Thompson's supervisors responded to his inquiries by disparaging and reprimanding him, and shuffling him among various security and audit positions. Undeterred, Thompson continued to investigate and report the results to Lottery Board officials. As a final measure of retaliation, in August 1996, a supervisor reassigned Thompson from his job as Security Systems Administrator to a post as Security Officer. The very next day, he told Thompson the new job had previously been designated for elimination under an agency-wide reduction-in-force, effective in September 1996, and then placed him on leave. When Thompson's job was eliminated in September,

he was reassigned to a temporary post, which he held until it expired in January 1997. Compl. ¶¶ 10–24, 32–33, 45–70.

Thompson sued the District of Columbia and others, alleging (among other claims) that the District punished him for First Amendment-protected speech and fired him in violation of the Due Process Clause of the Fifth Amendment. In 2004, the district court dismissed Thompson's complaint, but this court reversed the dismissal. *See Thompson v. District of Columbia*, 428 F.3d 283 (D.C. Cir. 2005). On remand, the district court again dismissed his claims, *see Thompson v. District of Columbia*, 478 F. Supp. 2d 5 (D.D.C. 2007), and Thompson again appeals.

II

Thompson alleges the District of Columbia violated his First Amendment rights by punishing him for speaking out about corruption. The last time Thompson's case came before this court, we reversed the dismissal of his First Amendment claim, explaining the complaint did not provide a sufficient factual record for the district court to balance Thompson's interest "in commenting upon matters of public concern" with the government's interest in "promoting the efficiency of the public services it performs through its employees." *See Thompson*, 428 F.3d at 285–87. Shortly thereafter, the Supreme Court decided *Garcetti v. Ceballos*, 547 U.S. 410 (2006), holding that a threshold question— "whether the [government] employee spoke as a citizen"— must be decided before any balancing of interests. *Id.* at 418. As the Court explained, "[t]he First Amendment limits the ability of a public employer to leverage the employment relationship to restrict … the liberties employees enjoy in their capacities as private citizens." *Id.* at 419. However, the First Amendment places no restrictions on the government's

right to punish employees for speech made "pursuant to their official duties." *Id.* at 421. Whether employees spoke pursuant to their official duties, and thus receive no First Amendment protection, is a "practical" inquiry—focusing not on formal job descriptions, but on the employees' actual responsibilities. *Id.* at 424.

Ordinarily, employees who make recommendations to their supervisors on subjects directly related to their jobs are carrying out their official duties and thus receive no First Amendment protection. *See Davis v. McKinney*, 518 F.3d 304, 313 n.3 (5th Cir. 2008) ("the caselaw is unanimous in holding that employee's communications that relate to his own job function up the chain of command, at least within his own department or division, fall within his official duties and are not entitled to First Amendment protection."). In *Garcetti*, the Supreme Court concluded that a calendar deputy for a state district attorney's office, who wrote a memorandum to his supervisors recommending the dismissal of a pending prosecution, was speaking as part of his job. 547 U.S. at 421. Similarly, in *Wilburn v. Robinson*, 480 F.3d 1140, 1150–51 (D.C. Cir. 2007), this court held an employee who complained to her employer's personnel office about discrimination in salary decisions was speaking pursuant to her employment responsibilities, which included exposing discriminatory practices in salary and hiring matters. Significantly, in *Freitag v. Ayers*, 468 F.3d 528 (9th Cir. 2006) (as amended), the Ninth Circuit held a prison guard who informed her state Senator and Inspector General about harassment she suffered at work was speaking as a citizen, and thus protected by the First Amendment; but also held she was speaking as an employee when she reported the same misconduct to her supervisors. *Id.* at 545–46.

When employees make recommendations to supervisors on subjects directly related to their jobs, they are speaking as employees even if the supervisors discourage this speech. In *Green v. Board of County Commissioners*, 472 F.3d 794 (10th Cir. 2007), a lab technician alleged her bosses retaliated against her for disregarding their instructions and sending samples for outside testing. The Tenth Circuit explained the First Amendment did not protect the employee from discipline because "[h]er disagreement with her supervisors' evaluation of the need for a formal testing policy, and her unauthorized obtaining of the confirmation test to prove her point, inescapably invoke *Garcetti*'s admonishment that government employee's First Amendment rights do 'not invest them with a right to perform their jobs however they see fit.'" *Id.* at 801 (quoting *Garcetti*, 547 U.S. at 422). Similarly, in *McGee v. Public Water Supply*, 471 F.3d 918 (8th Cir. 2006), an employee alleged his boss fired him for speaking out about a project's non-compliance with environmental standards. The Eighth Circuit held his speech was part of his job responsibilities, and thus not protected by the First Amendment, even though his supervisor had already removed him from the project and told him not to worry about any environmental problems. *Id.* at 921.

In this case, Thompson began his investigations when he was Chief of Security, charged with "protecting the assets and personnel of the D.C. Lottery through a comprehensive system of physical and internal controls designed to detect fraud, waste, and abuse within all operational components of the D.C. Lottery." Compl. ¶ 11. He claims at least some of his subsequent investigations were outside of his job duties, largely because his supervisors shuffled him among various security and auditor positions. For example, when Thompson tried to audit a contractor for failing to reimburse the Lottery Board, one of his supervisors "directed [him] to leave [the

contractor] alone, telling [him] that he was not permitted to audit [the contractor] because he had no right or authority to do so." Compl. ¶ 19.[1]

Thompson's argument is no different from that rejected in *Green* and *McGee*. He does not dispute that his initial investigation was a direct part of his job duties, and thus unprotected by the First Amendment. He continued to press on with similar investigations despite interference and transfers—but throughout the entire period, his job was related to maintaining the integrity of the Lottery Board's operations and finances, albeit in changing capacities. Instructively, he continued to report his findings to Lottery Board officials, through verbal communications and written reports. As our sister circuits recognized in *Green* and *McGee*, it would be incongruous to interpret *Garcetti*, a case concerned with allowing the government to control its employees within their jobs, as giving broader protections to disobedient employees who decide they know better than their bosses how to perform their duties. In sum, we hold Thompson's complaints to Lottery Board officials about corruption were clearly made pursuant to his official job duties and thus the District of Columbia did not violate his First Amendment rights by sanctioning him for his speech.

## III

Thompson alleges the District of Columbia terminated him without affording him the procedures guaranteed by the

---

[1] Thompson urges us to go beyond the complaint and consider deposition testimony from two of his supervisors, who claimed he was acting outside of his duties during some of his investigations. We need not decide whether we can consider this testimony because the complaint already alleges that Thompson's supervisors told him he was acting outside of his official duties.

Due Process Clause of the Fifth Amendment. To state a valid procedural due process claim, Thompson must first show he had a protected property interest in his job. "Property interests are not created by the Constitution, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law." *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 538 (1985). Thompson had a property interest in his job only if, under District of Columbia law, "he did not serve in his job at his employer's 'will,' but he could be removed only 'for cause.'" *Laureano-Agosto v. Garcia-Caraballo*, 731 F.2d 101, 103 (1st Cir. 1984). At the relevant time, the District of Columbia's Comprehensive Merit Personnel Act ("CMPA") provided a "permanent employee in the Career or Educational Service … may be … *removed from the Service only for cause* and only in accordance" with the provisions of the CMPA. D.C. Code § 1-617.1(b) (1981) (emphasis added). Accordingly, a D.C. Career Service employee had a protected property interest in his job and could not be "removed from the Service" without receiving due process. *See D.C. Dep't of Corr. v. Teamsters Union Local No. 246*, 554 A.2d 319, 326 (D.C. 1989).

Assuming Thompson's job was a Career Service position, we must decide whether he correctly claims he was "removed from the Service" in August 1996.[2] At that time, Thompson's boss moved him from a permanent position as a Security Systems Administrator to a job as a Security Officer, informed him the new job was already slated for elimination under an agency-wide reduction-in-force ("RIF"), effective the following month, and immediately placed him on leave. Under the law of both the District of Columbia and this Circuit, an employee with a property interest in his job has the

---

[2] Later in this section, we turn to whether Thompson's job was a Career Service position at this time.

right to due process if he raises a *non-frivolous* claim that his employer eliminated his job, not as a genuine cost-saving measure, but as a pretext for getting rid of him. *See Levitt v. D.C. Office of Employee Appeals*, 869 A.2d 364, 366 & n.4 (D.C. 2005) (citing *Fitzgerald v. Hampton*, 467 F.2d 755, 758–60 (D.C. Cir. 1972)); *Thompson*, 428 F.3d at 288. This case presents a somewhat different question: When an employee is transferred to a position scheduled for imminent elimination under an otherwise legitimate RIF, does the deprivation of his property interests occur when he is transferred or when the RIF actually eliminates the position?[3]

We hold that when an employer attempts to get rid of an employee by transferring him from a Career Service position to a job already scheduled for imminent elimination pursuant to an otherwise legitimate RIF, the employee is constructively removed from the Service at the time of the transfer. *Cf. Clark v. Twp. of Falls*, 890 F.2d 611, 618 (3d Cir. 1989) (constructive demotions can trigger due process rights). While no case we have found confronted this exact situation, our holding is consistent with District of Columbia and Circuit law because it recognizes a Career Service employee's right to due process at the time of the allegedly pretextual action. *See Levitt*, 869 A.2d at 366 & n.4 (citing *Fitzgerald*, 467 F.2d at 758–60). Indeed, it would make little sense to hold an employee's due process rights are not triggered until the RIF actually eliminates his job, in a case where the RIF is a genuine streamlining measure that the employee has not

---

[3] We do not address the question of when the deprivation of a property interest occurs in a situation where the employee alleges his employer came up with an illegitimate RIF specifically to get rid of him. *See, e.g.*, *Levitt*, 869 A.2d at 366 (employer transferred employee into a newly created Career Service position and then abolished the "very position it had specifically created for him.").

challenged. It is far more sensible to allow the employee to bring his challenge at the time of the prextual action—his pretextual transfer to the doomed position.

Applying these principles to the present case is straightforward. Thompson's boss moved him to a job that was scheduled for elimination under an agency-wide RIF. Thompson does not argue that this RIF, which eliminated many positions for streamlining purposes, was illegitimate. Rather, his claim is he was transferred to one of the positions scheduled for elimination as a mere pretext for getting rid of him. Accordingly, assuming Thompson was a Career Service employee in August 1996, his transfer was a constructive "removal from the service" under the CMPA because he raised a non-frivolous claim that this transfer was pretextual.[4]

Next, we must decide whether Thompson was a Career Service employee in August 1996. The parties agree that Thompson was a Career Service employee throughout most of his time with the Lottery Board. The remaining dispute is whether anything deprived him of Career Service status before August 1996. On April 26, 1996, Congress enacted the Omnibus Consolidated Rescission and Appropriations Act ("OCRA"), Pub. L. No. 104-134, § 152(a), 110 Stat. 1321, 1321-102, which provided, in pertinent part:

> [T]he heads and all personnel of the following offices, together with all other District of Columbia executive

---

[4] The District of Columbia argues Thompson was not deprived of his job until January 1997, when the temporary position to which he was assigned after the September 1996 RIF, expired. We need not decide whether the January 1997 termination was a "remov[al] from the Service," within the meaning of CMPA, because answering that inquiry does not change the status of the August 1996 transfer as a constructive removal, requiring its own process.

branch accounting, budget, and financial management personnel, shall be appointed by, shall serve at the pleasure of, and shall act under the direction and control of the Chief Financial Officer:  The Office of the Treasurer.  The Controller of the District of Columbia.  The Office of the Budget.  The Office of Financial Information Services.  The Department of Finance and Revenue.

In *Leonard v. District of Columbia*, 794 A.2d 618, 625–27 (D.C. 2002), the D.C. Court of Appeals held all employees covered by OCRA became at-will, with no property interests in their job.  However, OCRA did not cover Lottery Board employees—the Lottery Board was not one of OCRA's listed offices or departments and the District of Columbia's brief does not argue that Lottery Board employees were "other District of Columbia executive branch accounting, budget, and financial management personnel" at any point before Thompson was placed in the doomed position in August 1996.[5]  Rather, the District points to two orders issued by the District of Columbia Financial Responsibility and Management Assistance Authority and the District of Columbia Chief Financial Officer ("CFO"), which purported to place the Lottery Board under the CFO and make its employees at-will.  Whatever the impact or validity of these orders, they have no effect on this case because they issued in

---

[5] The Lottery Board was established in 1981 and consisted of five members, appointed by the Mayor of the District of Columbia. *See* D.C. Code. § 3-1301.  The record sheds no light on the proper classification of Board employees, so we rest our decision on the District's failure to argue these employees were "other District of Columbia executive branch accounting, budget, and financial management personnel," within the meaning of OCRA.

September 1996, a month after Thompson was constructively removed from the Service.[6]

Thompson was a Career Service employee when his supervisor transferred him to a doomed position in order to get rid of him, thus depriving him of his property interest in his job. Because the District of Columbia does not argue that Thompson's claim of pretext was frivolous and does not contend it afforded him sufficient process, we reverse the dismissal of his due process claim.

\* \* \*

The judgment of the district court is therefore *affirmed* in part and *reversed* in part, and the case is remanded for further proceedings.

*So ordered.*

---

[6] Any other subsequent changes to the status of Lottery Board employees are similarly irrelevant.