# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued November 18, 2015      Decided August 12, 2016

No. 14-7210

JAMES A. THOMPSON, JR.,
APPELLANT

v.

DISTRICT OF COLUMBIA, ET AL.,
APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:97-cv-01015)

———

*S. Micah Salb* argued the cause for appellant. With him on the briefs was *Dennis Chong*.

*Mary L. Wilson*, Senior Assistant Attorney General, Office of the Attorney General for the District of Columbia, argued the cause for appellee District of Columbia. With her on the brief were *Karl A. Racine*, Attorney General, *Todd S. Kim*, Solicitor General, and *Loren L. AliKhan*, Deputy Solicitor General.

Before: GRIFFITH, SRINIVASAN, and MILLETT, *Circuit Judges*.

2

Opinion for the Court filed by *Circuit Judge* GRIFFITH.

GRIFFITH, *Circuit Judge*: In 1996, the District of Columbia Lottery and Charitable Games Control Board terminated James Thompson, Jr.'s employment by assigning him to a position that had been marked for elimination only the day before. Thompson filed suit under 42 U.S.C. § 1983, alleging in part that his termination violated his Fifth Amendment right to due process. In the almost twenty years since, the district court has dismissed Thompson's complaint three times, and we have reversed two of those dismissals. Before us now is the district court's most recent dismissal of Thompson's complaint, as well as its denial of his motion for summary judgment. We reverse the district court again and remand for the district court to enter partial summary judgment for Thompson. Only two issues will then remain to be resolved on the merits: whether the District can be held liable under section 1983 for the violation of Thompson's due process rights and, if it can, a determination of the damages.

I

James A. Thompson, Jr. is an experienced auditor and security systems expert. He served as the Chief of the Financial Division of the Metropolitan Police for several years before joining the Lottery and Charitable Games Control Board (Lottery) as an auditor in 1985. Once at the Lottery, he was promoted twice before becoming Security Systems Administrator in 1996. In this position, Thompson spearheaded efforts to identify threats to the integrity of the Lottery's operations.

Thompson's tenure soured, however, when several audits he supervised unearthed what he thought was unethical, if not illegal, behavior. For example, in a February 1996 audit,

Thompson found that equipment purchased by the Lottery from a subcontractor for almost $7 million had been placed on a depreciation schedule that gave the equipment "no monetary value" just five years later. J.A. 149-53. In his report, Thompson explained that Lottery officials had certified the computer equipment as worthless and returned it to the same subcontractor for "disposal" as part of a new purchase agreement. *Id.* The audit report described this as "an excessively costly business decision," in part because the equipment likely had at least some monetary value due to recent upgrades. *Id.* at 150-51. Thompson concluded, as a result, that the "business arrangement [was] unethical at the best; and may be interpreted as a misappropriation of government assets, at worst." *Id.* at 157. This conclusion, Thompson further noted, was consistent with news reports of misappropriation and fraudulent procurement activities at the Lottery.[1] *Id.*

Throughout the summer of 1996, Thompson brought the troubling conduct he had uncovered to the attention of his supervisor, the Lottery's Executive Director, Frederick King. But King refused to investigate the misconduct. Instead, King put an end to Thompson's employment. On August 22, 1996, in the midst of a District budget crisis, King designated a Security Officer position for elimination through a reduction

---

[1] Thompson's reports and the newspaper articles were not the only indications that the Lottery's contracting practices were highly irregular. A later external investigation by the District's Financial Responsibility and Management Assistance Authority confirmed that "the contracting practices of the Lottery . . . raise[d] serious questions of propriety and conflict of interest." J.A. 165. The issues the Authority found were serious enough that the Lottery was required to revise one of its "major contracts." *Id.*

in force.[2] The next day, King reassigned Thompson from his job as Security Systems Administrator to the doomed position.

The Lottery gave Thompson no notice of this reassignment and offered him no hearing to challenge the action. In fact, the personnel form signed by King to effectuate the reassignment represented only that the action fixed "a classification error." Regardless of what it was called, this fix left Thompson without a job because several days later, King called Thompson into his office to inform him that his position had been eliminated in a reduction in force. King gave Thompson a personnel form explaining that he would be removed from service in 30 days and that he had a right to appeal that separation to the District's Office of Employee Appeals. But the form made no mention of Thompson's *prior* reassignment to the position that had been marked for elimination. As a result, it did not inform Thompson of any right he might have had to challenge *that* employment action. That same day, King also placed Thompson on paid leave for several weeks. While Thompson was eventually allowed to return to work in a temporary position, that position expired in January 1997, again leaving Thompson without a job. Soon after, the Lottery hired a new security manager.

Later that same year, the Lottery Control Board removed King from office after an FBI investigation into the Lottery's

---

[2] A reduction in force is a "reduction in personnel caused by a lack of funding or the discontinuance or curtailment of a department, program or function of an agency" that has no "punitive or corrective" role. *See Davis v. Univ. of D.C.*, 603 A.2d 849, 852 n.8 (D.C. 1992). *See generally* William E. Slack & Mark G. Weisshaar, Note, *Reduction in Force: A Guide for the Uninitiated*, 44 GEO. WASH. L. REV. 642 (1976).

operations. The Board found that King had "expos[ed] the agency to liability" through his questionable "personnel and other actions." J.A. 163. In particular, the Board identified King's "dismantl[ing] the security division, [and thus] putting the agency at risk," as a justification for his removal. *Id.*

On May 12, 1997, Thompson filed this action under 42 U.S.C. § 1983, claiming, as relevant here, that he was denied his Fifth Amendment right to due process prior to his termination at the Lottery. *See* U.S. CONST. amend. V. After a motions practice that lasted seven years, the district court concluded that Thompson had failed to state a claim. We reversed the district court in *Thompson v. District of Columbia*, 428 F.3d 283 (D.C. Cir. 2005) ("*Thompson I*"), holding that Thompson stated a claim when he alleged that he was transferred without due process to a position that was immediately eliminated in a reduction in force. *Id.* at 288.

On remand, the district court dismissed the case once again, this time concluding that because Thompson had no protected property interest in his position, he was unable to establish an essential element of a due process claim. *Thompson v. District of Columbia*, 478 F. Supp. 2d 5, 9-10 (D.D.C. 2007); *see UDC Chairs Chapter, Am. Ass'n of Univ. Professors v. Bd. of Trs. of the Univ. of D.C.*, 56 F.3d 1469, 1471 (D.C. Cir. 1995) (explaining that the two prongs of a due process claim are whether the employee was deprived of a protected interest, and if so, whether he received the process he was due). We reversed the district court in *Thompson v. District of Columbia*, 530 F.3d 914 (D.C. Cir. 2008) ("*Thompson II*"), holding that Thompson had a protected property interest in his position because he was a career civil servant under District of Columbia law and that he could not be removed from that position without due process. *Id.* at 918-20. We also held that transferring Thompson to a

canceled position was a constructive removal from service that deprived him of his protected interest in his job. *Id.* at 919.

For nearly five years after this second remand, the district court presided over another lengthy pretrial process. On March 1, 2013, Thompson filed a motion for summary judgment, in which he argued that there were no factual issues left to be resolved after nearly sixteen years of discovery, and that the undisputed facts demonstrated that he was entitled to judgment as a matter of law. Almost a year later, the district court denied that motion without explanation in a minute order. Thompson then tried a new tack. He filed a motion to set a trial date or, in the alternative, to reassign the case to a judge who had docket space for an immediate trial. In his motion, Thompson pointed out that his case had stalled well past the four years that it takes an average litigant in our district courts to complete a trial and notified the court that he was of increasingly poor health and advanced age.

The district court responded by holding a pretrial conference where the court directed the parties to file additional pleadings on what damages a jury could award Thompson. After considering the parties' responses, and with no motion to dismiss before it, the district court entered a minute order dismissing Thompson's action for the third time. The written order that followed explained that Thompson could not recover compensatory damages for his termination unless he could show that he would not have been terminated had he been given due process. *Thompson v. District of Columbia*, No. 97–1015 (D.D.C. Feb. 18, 2015). In the district court's view, Thompson had made no such showing. *Id.* Thompson appealed.

We treat this most recent dismissal as a grant of summary judgment to the District, because the district court went beyond the pleadings. *See id.* (reasoning that Thompson "has offered no such evidence" to support his damages claim); *Yates v. District of Columbia*, 324 F.3d 724, 725 (D.C. Cir. 2003) (per curiam). We have jurisdiction under 28 U.S.C. § 1291 to review the district court's decision, as well as its earlier denial of Thompson's motion for summary judgment.

Our review is de novo. *Wilburn v. Robinson*, 480 F.3d 1140, 1148 (D.C. Cir. 2007). We view the evidence in the light most favorable to the party opposing summary judgment, draw all reasonable inferences in that party's favor, and avoid weighing the evidence or making credibility determinations. *Lathram v. Snow*, 336 F.3d 1085, 1088 (D.C. Cir. 2003) (citing *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150 (2000)). Summary judgment is appropriate only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). There is a genuine issue of material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Because Thompson seeks to hold the District liable under section 1983, he must show not only that his right to due process was abridged, but that a policy or custom of the District caused the violation. *See Warren v. District of Columbia*, 353 F.3d 36, 38 (D.C. Cir. 2004). We conclude that Thompson has shown that his due process rights were violated and that this violation caused his alleged damages. Accordingly, we reverse the district court's grant of summary judgment to the District and, in part, its denial of Thompson's motion for summary judgment. But we remand to the district court to address whether the District can be held liable under

section 1983 for this violation and, if it can, for a determination of the amount of damages to which Thompson is entitled.

II

We engage in a "familiar two-part inquiry" to determine whether Thompson's due process rights were violated. *See UDC Chairs Chapter*, 56 F.3d at 1471 (quoting *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 428 (1982)). We must determine whether Thompson was deprived of a protected interest, and, if so, whether he received the process to which he was entitled. *Id.* In *Thompson II*, we already decided Thompson was deprived of a protected property interest in his Security Systems Administrator position when he was transferred to the Security Officer position. 530 F.3d at 918-20. Typically, we would then need only to ask whether Thompson received the process he was due. Because the District does not contest that Thompson received no notice of the reassignment that effectively ended his full-time employment work at the Lottery, our inquiry should be at an end. But the District resists this result on two separate grounds, neither of which has merit.

The District urges us to revisit our conclusion in *Thompson II* that Thompson was deprived of his property interest at the time of his assignment to the Security Officer position. *Id.* Our conclusion from *Thompson II* is not binding, the District contends, because there we were asked to review the dismissal of a complaint and had to accept as true Thompson's allegations. But now that our review is at summary judgment, the District argues that a reasonable juror could question whether the Lottery's employment action was a "transfer" and instead conclude that the Lottery merely "reclassified" Thompson. The District relies on a single

personnel form issued on the date Thompson was reassigned, which summarily states that the change corrected a classification error. Correcting this error, the District argues, is not a "transfer" that triggers any process.

But the argument that Thompson was "reclassified" rather than "transferred" rests on a distinction without a difference. The bottom line of our holding in *Thompson II* was that Thompson, as a career civil servant, was stripped of his property interest when he was placed in a position that had previously been marked for elimination. We will not revisit that legal conclusion now. *See Crocker v. Piedmont Aviation, Inc.*, 49 F.3d 735, 739 (D.C. Cir. 1995) ("When there are multiple appeals taken in the course of a single piece of litigation, law-of-the-case doctrine holds that decisions rendered on the first appeal should not be revisited on later trips to the appellate court."). Whether Thompson was "transferred" or "reclassified" into this position, he was effectively terminated at that time because the Security Officer position had already been slated for elimination. For our purposes, it is the substance of a constructive termination, and not the semantics of a "transfer" or "reclassification," that matters in determining whether Thompson was deprived of his protected property interest in his job.

We likewise reject the District's argument that Thompson received all of the process that he was due. In support, the District points to the notice that Thompson received of his right to challenge the elimination of his *new* position in the reduction in force. But, as we explained in *Thompson II*, Thompson was constructively terminated at the time of his transfer, not when this new position was eliminated. He thus had a right to notice of that transfer and a hearing to challenge his transfer before it was made. *See Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985) (explaining that

constitutional due process requires a hearing "*prior to* the discharge of an employee who has a constitutionally protected property interest in his employment" (emphasis added)); *Thompson II*, 530 F.3d at 919 ("District of Columbia and Circuit law . . . recognize[] a Career Service employee's right to due process *at the time* of the allegedly pretextual action." (emphasis added)). The District does not contend that Thompson received any such notice or opportunity to contest the transfer. And, although the Supreme Court has indicated that a hearing may be postponed in "extraordinary situations where some valid governmental interest is at stake," *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 570 n.7 (1972) (citation omitted), the District does not argue that any such circumstances existed in this case. At a minimum then, Thompson's pre-deprivation right to due process was violated when the District assigned him to a position scheduled for imminent elimination without notice or a hearing.

Moreover, Thompson testified that he was *never* notified of his right to contest the transfer. The District never presents any evidence in rebuttal by showing, for example, that he was in fact notified of this right at a meaningful time *after* the constructive termination. *See Propert v. District of Columbia*, 948 F.2d 1327, 1331-32 (D.C. Cir. 1991) ("The essence of due process is the requirement that a person in jeopardy of serious loss [be given] notice of the case against him and opportunity to meet it . . . at a meaningful time and in a meaningful manner." (citations omitted)). The hearing the District offered Thompson to challenge the elimination of the Security Officer position did not give him a meaningful opportunity to contest the prior constructive termination because Thompson was never notified that he could challenge that action. As a result, we conclude that Thompson's right to due process was violated.

III

The District is correct that Thompson cannot recover compensatory damages arising from a termination that would have occurred even had he been given due process. *See Carey v. Piphus*, 435 U.S. 247, 263 (1978); *see also Montgomery v. City of Ardmore*, 365 F.3d 926, 937 (10th Cir. 2004). But the district court erred when it granted summary judgment to the District on the ground that Thompson failed to show that, had he been given due process, he would have kept his job. Once a plaintiff establishes that he was terminated without due process and demonstrates damages arising from that termination, the defendant is responsible for those damages unless the *defendant* shows they would have occurred regardless. *See, e.g.*, *Brewer v. Chauvin*, 938 F.2d 860, 864-65 (8th Cir. 1991) (en banc). Because Thompson met his burden under this framework and the District failed to meet its burden, Thompson is entitled to recover any compensatory damages that he can show resulted from his termination.

In *Mount Healthy City School District Board of Education v. Doyle*, 429 U.S. 274 (1977), the Court considered a suit for damages based on a claimed violation of the First Amendment. Doyle was an untenured teacher involved in several incidents of allegedly unprofessional behavior. *Id.* at 281-82. After the school board decided that Doyle should not be rehired, *id.* at 282-83 n.1, Doyle sued, claiming the decision violated his First Amendment right to free speech. The district court agreed and held that Doyle was entitled to backpay and reinstatement. *Id.* at 283-86. The Supreme Court affirmed that a constitutional violation had occurred, but concluded that the *school board* was entitled to "attempt[] to prove to a trier of fact that quite apart from such conduct Doyle's record was such that he would not have been rehired in any event." *Id.* at 286. The Court thus placed the

burden on Doyle to show that his conduct was constitutionally protected and a substantial factor in the school board's adverse employment decision. *Id.* at 287. But once that burden was met, the school board could escape responsibility for the resulting damages by showing that it would have declined to rehire Doyle for reasons other than his conduct protected by the First Amendment. *Id.*

The Court reaffirmed this framework a year later in *Carey v. Piphus*, 435 U.S. 247 (1978). There, schoolchildren argued that they had been suspended without due process and sought compensatory damages. In reversing the district court's dismissal of the complaints, the Seventh Circuit recognized that the defendants could avoid paying compensatory damages if *they* could show, on remand, that the children would have been suspended even with a hearing. *Id.* at 260. The Supreme Court agreed, *id.*, and ever since then has assumed that this framework applies when it considers damages for other constitutional torts. *See, e.g.*, *Texas v. Lesage*, 528 U.S. 18, 21 (1999) (per curiam) (describing the underlying principle in constitutional tort claims as providing that "[t]he government can avoid liability by proving that it would have made the same decision without the impermissible motive").

The best reading of *Doyle* and *Carey*—as the Third, Fifth, Sixth, Seventh, Eighth, and Tenth Circuits have held—is that a plaintiff can recover compensatory damages for a defendant's unconstitutional conduct unless the *defendant* shows that the injury would have occurred anyway.[3] This rule is especially well suited to cases like

---

[3] *See Alexander v. Polk*, 750 F.2d 250 (3d Cir. 1984); *Wheeler v. Mental Health & Mental Retardation Auth. of Harris Cty., Tex.*, 752 F.2d 1063 (5th Cir. 1985); *Franklin v. Aycock*, 795 F.2d 1253 (6th Cir. 1986); *Patkus v. Sangamon-Cass Consortium*, 769 F.2d

13

Thompson's, where the defendant is in the best position to prove an alternative, permissible justification for its adverse employment action. Accordingly, the district court erred when it granted summary judgment to the District on the basis that Thompson—the *plaintiff*—had not shown that he would have kept his job even given notice and a hearing. This was the *District*'s burden and no reasonable juror could conclude from the record that it was met.

The District protests that a reasonable juror could conclude that Thompson would have been terminated for cause based on an allegedly adverse performance evaluation that he received a month before his termination. But the District conceded below that the "satisfactory rating" that Thompson received was not adverse. *See* Defs.' Resp. to Pl.'s Statement of Material Facts that Are Not Disputed, No. 97-cv-01015, J.A. 263 ("[T]he defendants deny that the plaintiff received any adverse performance evaluation in July 3, 1996, and submit that the reason that he received a 'satisfactory rating' is due to the fact that his supervisor only evaluated him for three months and did not have sufficient time to evaluate Mr. Thompson as a manager."). The District cannot change its position now. In any event, a reasonable juror could not conclude that a "satisfactory" rating provided cause to fire Thompson.

In sum, Thompson has done everything required to show that the damages arising from his termination were caused by the violation of his due process rights. The District has not met its burden to show that Thompson would have lost his position even if he had received due process and, as a result,

1251 (7th Cir. 1985); *Brewer v. Chauvin*, 938 F.2d 860 (8th Cir. 1991) (en banc); *McClure v. Indep. Sch. Dist. No. 16*, 228 F.3d 1205 (10th Cir. 2000). *But cf. Miner v. City of Glens Falls*, 999 F.2d 655 (2d Cir. 1993).

we reverse the district court's grant of summary judgment to the District and remand for the district court to enter partial summary judgment for Thompson as to the violation of his due process rights.

## IV

The District asserts that, even if Thompson was denied due process, *Monell v. Department of Social Services*, 436 U.S. 658 (1978), shields the city from liability for his termination. In *Monell*, the Supreme Court established that a municipality is liable under 42 U.S.C. § 1983 for constitutional violations caused by its policies or customs. *Id.* at 690-91. But "a municipality cannot be held liable *solely* because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Id.* at 691. The injury must instead be inflicted by municipal "lawmakers or by those whose edicts or acts may fairly be said to represent official policy." *Id.* at 694. The Supreme Court has held that a single action can represent municipal policy where the acting official has final policymaking authority over the "particular area, or . . . particular issue." *McMillian v. Monroe Cty.*, 520 U.S. 781, 785 (1997); *City of St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988) (plurality opinion). Here, that means the District is liable for Thompson's termination if King was a final policymaker for Lottery personnel decisions at the time of the reduction in force that cost Thompson his job. But the district court did not reach this issue and we cannot decide it on the inadequate record before us. As a result, we must remand this issue to the district court for further development.

Determining whether an official is a final policymaker for section 1983 purposes is no simple task. *See Auriemma v. Rice*, 957 F.2d 397, 400 (7th Cir. 1992) (describing the

decisions of the circuits on this issue as "so varying that there is little point in canvassing them"). While the Supreme Court has resolved that the question is a legal one for the court to decide based on state or local law, *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989), the Court has not settled on a precise test for determining what type of authority under local law makes an official a "final policymaker." Its prior plurality opinions have emphasized that to hold a municipality liable for an official's one-time action, the official must have final policymaking authority in the particular area, and the challenged action must have been taken pursuant to that authority. *See Praprotnik*, 485 U.S. at 123 (plurality opinion); *Pembaur v. City of Cincinnati*, 475 U.S. 469, 482-83 (1986) (plurality opinion).

In analyzing whether the official had policymaking authority in the area at issue, a plurality of the Court has identified two guiding inquiries. First, if the official's decisions were constrained by policies enacted by others, then "those policies, rather than the subordinate's departures from them, are the act of the municipality." *Praprotnik*, 485 U.S. at 127 (plurality opinion). And second, if the official's decisions were reviewable by the city's "authorized policymakers," then the official is not the *final* policymaker. *Id.* A plurality in *Pembaur v. City of Cincinnati* offered the following hypothetical to explain that an official is not a "final policymaker" merely because he has the authority to make discretionary decisions:

> [T]he County Sheriff may have discretion to hire and fire employees without also being the county official responsible for establishing county employment policy. If this were the case, the Sheriff's decisions respecting employment would not give rise to municipal liability, although similar decisions with respect to law

enforcement practices, over which the Sheriff *is* the official policymaker, *would* give rise to municipal liability. Instead, if county employment policy was set by the Board of County Commissioners, only that body's decisions would provide a basis for county liability. This would be true even if the Board left the Sheriff discretion to hire and fire employees and the Sheriff exercised that discretion in an unconstitutional manner; the decision to act unlawfully would not be a decision of the Board. However, if the Board delegated its power to establish final employment policy to the Sheriff, the Sheriff's decisions *would* represent county policy and could give rise to municipal liability.

475 U.S. at 483 n.12 (plurality opinion).

Here, the District contends that King was not a final policymaker for the District's personnel decisions. According to the District, King possessed the same authority as the hypothetical Sheriff—*i.e.*, even though King, as the Executive Director of the Lottery, had discretion to hire and fire individual employees, the Lottery Board maintained final authority over both King and his personnel decisions. In support, the District points to a provision of the city code that gave the Board authority to direct and supervise King's employment of others at the Lottery. *See* D.C. CODE § 3-1303(d)(3) (2001) ("The Executive Director shall, subject to the direction and supervision of the Board . . . [e]mploy other assistants and employees in accordance with the District of Columbia Government Comprehensive Merit Personnel Act of 1978."); *see also id.* § 2-2503 (1981) (same).[4]

[4] It appears that the 1992 and 1998 supplements to the D.C. Code, where cited in this section, contain the same language that was in effect at the time of Thompson's termination. However, we were unable to locate an authoritative copy of the 1996 Supplement

According to the District, this provision cabined King's power to make personnel decisions by subjecting his decisions to oversight from the Board. Further, the District urges that the provision constrained King's discretion by requiring him to comply with the Comprehensive Merit Personnel Act (CMPA), which required that a career civil servant receive notice and a hearing before termination. The District argues that it cannot be subject to liability for King's deviation from that official municipal policy, because, in the Supreme Court's terms, the official "polic[y], rather than the subordinate's departures from [it], [is] the act of the municipality." *Praprotnik*, 485 U.S. at 127 (plurality opinion).

If our analysis were constrained to a single provision in the city code, the District's argument would be more persuasive than it is. Looking at this provision in tandem with other parts of the code, we conclude there is significant reason to believe that King *was* a final policymaker with regard to the types of Lottery personnel decisions that led to Thompson's constructive termination. We have already recognized that King had "absolute discretion 'to identify positions for abolishment'" for the purposes of the reduction in force at the time of Thompson's constructive termination. *See Thompson I*, 428 F.3d at 287 (citing D.C. CODE § 1-625.5(a) (1996 Supp.)). The D.C. Code further provided that King would "make a *final* determination that a position within the [Lottery] is to be abolished." D.C. CODE § 1-625.5(b) (1998 Supp.) (repealed) (emphasis added); *see also* Budget Support Temporary Act of 1995, D.C. Law 11-78, tit. IV(b).

---

to the D.C. Code. On remand, the parties should provide and cite to the law in effect in 1996, at the time of Thompson's termination.

Moreover, the record is replete with evidence that King exercised his authority over personnel matters without any control by other District officials. *See Praprotnik*, 485 U.S. at 145 (Brennan, J., concurring in the judgment) (noting that under section 1983, "the law is concerned not with the niceties of legislative draftsmanship but with the realities of municipal decisionmaking, and any assessment of a municipality's actual power structure is necessarily a . . . practical one"); *see also Jett*, 491 U.S. at 737 (The court determines who is a final policymaker by "[r]eviewing the relevant legal materials, including state and local positive law, as well as custom or usage having the force of law." (citation omitted)). King admitted, for example, that he alone drew up the list of positions to be terminated, moved employees around to avoid adverse repercussions from the reduction in force, and decided on the number and types of employees who should be eliminated. Indeed, King testified that no one supervised his decisions about personnel actions, and no evidence suggests otherwise. J.A. 90-92. Read together, the D.C. Code and King's testimony indicate that King's decisions were not in fact "review[ed]" by the "authorized policymakers" that the District argues constrained King. *Praprotnik*, 485 U.S. at 127 (plurality opinion); *see also Ware v. Jackson Cty.*, 150 F.3d 873, 882 (8th Cir. 1998) ("[T]he existence of written policies of a defendant are of no moment in the face of evidence that such policies are neither followed nor enforced."); *cf. Daskalea v. District of Columbia*, 227 F.3d 433, 442 (D.C. Cir. 2000) (holding a "'paper' policy cannot insulate a municipality from liability where there is evidence . . . that the municipality was deliberately indifferent to the policy's violation").

Nor is it clear that other policies restricted King's ability to terminate Thompson, such that those policies, "rather than the subordinate's departures from them," were the act of the

municipality. *Praprotnik*, 485 U.S. at 127 (plurality opinion). As Executive Director of the Lottery, King was the designated "personnel authority" for all Lottery employees except himself and the Deputy Director. *See* D.C. CODE § 1-604.6(b)(14) (1992 Supp.). This meant that King was at least empowered to implement "rules and regulations" governing Lottery personnel matters. *See id.* § 1-604.6. In fact, the code presumed that he would also issue rules, regulations, and standards pursuant to this authority. *Id.* § 1-604.1 ("Further, it is the intent of the Council that the rules, regulations, and standards *issued by the personnel authorities* under this chapter should be as flexible and responsive as possible and reflect an awareness of innovation in the fields of modern personnel management and public administration." (emphasis added)). Moreover, the District fails to point to evidence in the city's laws that might indicate that the Board ever exercised any of its authority to constrain King's policymaking by passing its own personnel policies to "direct" him. *See Vodak v. City of Chicago*, 639 F.3d 738, 747-48 (7th Cir. 2011) (concluding that a subordinate was a final policymaker despite a city council having authority that it did not use to enact ordinances to constrain the subordinate's authority).

At the time of Thompson's termination, King's personnel policies also seem to have been removed from the ordinary rules of oversight that the District points to as evidence that the Board maintained the ability to direct and supervise King's personnel decisions. *See* D.C. CODE § 1-625.5(g) (1998 Supp.) (repealed). In fact, the District seems to have expressly exempted King from the ordinary requirements of the CMPA in making these decisions. *See id.* § 1-625.5(a) ("Notwithstanding any other provision of law, regulation, or collective bargaining agreement either in effect or to be negotiated while this legislation is in effect for the fiscal year

ending September 30, 1996, each agency head is authorized, within the agency head's discretion, to identify positions for abolishment."); *see also id.* § 1-625.5(c) ("Notwithstanding any rights or procedures established by any other provision of this subchapter, any District government employee . . . who encumbers a position identified for abolishment shall be separated without competition or assignment rights, except as provided in this section."). The Council may thus have delegated final policymaking authority to King over Lottery personnel matters at the time of Thompson's termination, even if other municipal bodies also had policymaking authority.

Contrary to the District's argument, our decision in *Singletary v. District of Columbia*, 766 F.3d 66 (D.C. Cir. 2014), does not prevent this conclusion. In *Singletary*, we determined that the District could not be held liable under *Monell* for the Board of Parole's decision to revoke Singletary's parole because the Board was not a final policymaker when it came to parole revocation. *Id.* at 73-74. The Mayor had final rulemaking authority for parole revocations, which he had delegated to the Board's Chairperson, who had played no role in the decision to revoke Singletary's parole. *Id.* Even though the Board had final authority over the decision, it lacked the requisite policymaking authority under District law. *Id.* at 74. But here, District law gives us reason to believe that King *might have* held such final policymaking authority with regard to Lottery personnel matters. Accordingly, *Singletary* does not foreclose the conclusion that King may have set the municipal policy that was used in Thompson's termination.

Because neither party has fully briefed the impact of these provisions on the *Monell* analysis, however, we remand this issue to the district court for it to consider in the first

instance. On remand, Thompson may also present his alternative arguments for the District's liability under *Monell*—*e.g.*, that the District had developed a "policy or practice" of unconstitutional terminations at the Lottery.

V

Finally, we address Thompson's request that we reassign the case on remand. Although we are concerned with the district court's treatment of this case on the last remand, particularly the decision to *sua sponte* dismiss the case, the court's actions have not triggered the need for reassignment. *See United States v. Wolff*, 127 F.3d 84, 88 (D.C. Cir. 1997) (establishing that impartiality, the appearance of justice, and the possibility of waste and duplication are the three factors considered for reassignment). We are confident that the district court will act expeditiously on remand in this case.

VI

The district court's order granting summary judgment to the District of Columbia is reversed, the district court's denial of Thompson's summary judgment motion is reversed in part, and the case is remanded to the district court for further proceedings consistent with this opinion.