# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued October 7, 2022       Decided February 24, 2023

No. 21-7122

WARREN R. HARRIS,
APPELLANT

v.

MURIEL BOWSER, IN HER OFFICIAL CAPACITY AS THE MAYOR
OF THE DISTRICT OF COLUMBIA, ET AL.,
APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:18-cv-00768)

———

*Angela M. Farren* argued the cause for appellant. With her on the briefs were *Francis H. Morrison III*, *Mary N. McGarity Clark*, *Nicholas E. Gaglio*, and *Melanie Kiser*.

*Holly M. Johnson*, Senior Assistant Attorney General, Office of the Attorney General for the District of Columbia, argued the cause for appellees. With her on the brief were *Karl A. Racine*, Attorney General, *Caroline S. Van Zile*, Solicitor General, *Ashwin P. Phatak*, Principal Deputy Solicitor General, and *Carl J. Schifferle*, Deputy Solicitor General.

Before: HENDERSON and WALKER, *Circuit Judges*, and TATEL, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* WALKER.

WALKER, *Circuit Judge*: The District of Columbia Department of Behavioral Health had a policy of restraining civilly-committed hospital patients during transport to court hearings. It applied that policy to Warren Harris. He says the policy violated his Fifth Amendment right to be free from unjustified bodily restraint.

It did not.

## I. Background

In 2017, the Department of Behavioral Health recommended to the D.C. Superior Court that a civilly-committed patient named Warren Harris be conditionally released from St. Elizabeth's Hospital. To decide whether to accept that recommendation, the superior court scheduled a hearing.

Back then, the Department of Behavioral Health's policy was for the Department of Corrections to transport so-called "forensic" detainees from the hospital to court. JA 144. Forensic detainees include patients, like Harris, who have been found not guilty by reason of insanity.

During transit, the Department of Corrections places transportees in full restraints. Thus, on the way to and from his hearing, Harris was restrained using handcuffs, a waist chain, and leg restraints. The Department of Corrections also removed Harris's belt, forcing court staff to help him hold up his trousers at the hearing.

After the superior court granted Harris conditional release, he filed a § 1983 suit against an assortment of D.C. officials — including the directors of the Department of Corrections and the Department of Behavioral Health. *See* 42 U.S.C. § 1983. Harris alleged that they violated his Fifth Amendment due-process rights by transporting him in restraints. He sought damages for "pain and suffering, degradation, and humiliation" caused by the restraints. JA 16.[1]

The district court granted summary judgment for the D.C. officials. Though civilly-committed patients like Harris enjoy a Fifth Amendment right against bodily restraint, that right will sometimes give way to important government interests. That, the court held, was the case here.

Harris appealed. Reviewing the district court's decision de novo, we affirm. *See Thompson v. District of Columbia*, 832 F.3d 339, 344 (D.C. Cir. 2016).

## II. The Fifth Amendment Due Process Framework

The Fifth Amendment Due Process Clause guarantees that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law." U.S. Const. Amend. V. The "core of the liberty protected by the Due Process Clause" is the "liberty from bodily restraint." *Youngberg v. Romeo*, 457 U.S. 307, 316 (1982) (cleaned up); s*ee also Bolling v. Sharpe*, 347

---

[1] Harris also brought claims for injunctive and declaratory relief. But those claims are now moot. In 2021, D.C. changed its restraint policy. It now requires an individual assessment of a detainee's "risk of harm to [him]self or others or for elopement." JA 497. Had that policy been in place when Harris was transported, he likely would not have been restrained.

U.S. 497, 499 (1954) (Fifth Amendment protections apply to D.C.).

That right is retained when someone is lawfully confined, but it is "not absolute." *Youngberg*, 457 U.S. at 320. The government may restrain detainees, for instance, "to protect them as well as others from violence." *Id.* To decide whether a government intrusion on the right is allowed by the Constitution, courts "balance the liberty of the individual and the demands of an organized society." *Id.* (cleaned up); *see also Bell v. Wolfish*, 441 U.S. 520, 539 (1979).

The Supreme Court has given guidance about how the test works when a detainee has not been convicted of a crime. The two leading cases are *Bell*, 441 U.S. at 523, and *Youngberg*, 457 U.S. at 309.

In *Bell*, the Supreme Court considered the rights of pretrial detainees. 441 U.S. at 523. Because they have not been convicted, the government may not impose restrictions that are intended to punish. *Id.* at 535-37. Instead, restrictions must be "reasonably related to a legitimate government[ ] objective." *Id.* at 539. And even then, restrictions which are "excessive in relation to th[eir] purpose" are impermissible. *Id.* at 561. In deciding whether there is a legitimate, nonexcessive government interest, courts should defer to the "professional expertise of corrections officials," and not impose the "court's idea of how best to operate a detention facility." *Id.* at 539, 540 n.23 (cleaned up).

In *Youngberg*, the Supreme Court evaluated the rights of civilly-committed patients. 457 U.S. at 309. It found that "there are occasions [o]n which it is necessary for the [government] to restrain [patients]" as part of their medical treatment. *Id.* at 320. To decide whether a restraint violates due process,

a court should balance "the individual's interest in liberty against the [government's] asserted reasons for restraining individual liberty." *Id.* A decision to restrain a patient is "presumptively valid" if "made by a professional." *Id.* at 323. If so, "liability may be imposed only when the decision" is "a substantial departure from accepted professional judgment, practice, or standards." *Id.*

*Bell* and *Youngberg* require a similar analysis. Both ask whether the government's reason for imposing restraints furthers its legitimate interest. *Bell*, 441 U.S. at 540; *Youngberg*, 457 U.S. at 321. And both give deference to the "professional expertise" of government officials. *Bell*, 441 U.S. at 548 (cleaned up); *Youngberg*, 457 U.S. at 324.

But the two tests concentrate on different aspects of the inquiry. Under *Bell*, courts home in on whether the government's justification was "related to a legitimate nonpunitive . . . purpose." 441 U.S. at 561. Yet under *Youngberg*, courts focus on whether "professional judgment in fact was exercised." 457 U.S. at 321 (cleaned up). Though the differences between those standards might sometimes matter, they will often produce the same result. *Cf. Beaulieu v. Ludeman*, 690 F.3d 1017, 1032 (8th Cir. 2012) ("Whether one applies *Youngberg*'s professional judgment standard or *Bell*'s punitive versus nonpunitive distinction, the outcome is the same." (cleaned up)).

Perhaps for that reason, courts of appeals are split on which test applies where, as here, a civilly-committed patient is restrained for a nonmedical purpose. *See, e.g.*, *Rosado v. Maxymillian*, 2022 WL 54181, at *3 n.4 (2d Cir. 2022) (deferring under *Youngberg* to the "judgment exercised by security officials" tasked with ensuring that civilly-committed patients do not escape during transport); *Lane v. Williams*, 689 F.3d 879, 882 (7th Cir. 2012) (refusing to apply *Youngberg* to a

civil-commitment facility's security policy because that case applies only to "treatment decisions"); *Matherly v. Andrews*, 859 F.3d 264, 274-76 (4th Cir. 2017) (harmonizing *Bell* and *Youngberg* into one test).

We need not pick a side in that split. *Bell* and *Youngberg* each show that the D.C. officials did not violate Harris's Fifth Amendment rights.

## III. The Restraints Were Justified Under *Bell*

Start with *Bell*. To survive Fifth Amendment scrutiny, restrictions must be "reasonably related to a legitimate," nonpunitive, "government[ ] objective." *Bell*, 441 U.S. at 539. And those restrictions must not be "excessive in relation to that purpose." *Id.* at 561.

The Department of Behavioral Health's restraint policy clears that test. As in *Bell*, the policy is "reasonably related to . . . maintaining . . . security." *Id.* at 540. The policy required forensic detainees to be transported by the Department of Corrections. And the Department of Corrections restrained transportees to "prevent injuries, escapes, and to safeguard the public." JA 459. According to the unrebutted testimony of the Government's expert, the policy achieved that goal: "restraints" ensure "the safety of individuals being transported, the staff members and the public, and also . . . prevent or discourage escape." JA 508-09 (declaration of Roy Gravette).

The policy was also not excessive. The Government's expert testified that "the decision to use handcuffs, leg irons[,] and a belly chain was appropriate for the type of trip and [the] circumstances." *Id.* at 509. Plus, transporting detainees in full restraints for security reasons "is a common practice among corrections systems nationwide." *Id.* at 494 (declaration of

John M. Armstrong, Commander of the D.C. Court Transport Unit). That suggests the Department's transport policy was not so outside the bounds of normal practice that we should view it as unconstitutionally excessive.[2]

True, Harris's expert says "it would be unusual for a correctional department to assert its own restraint practices" over a civilly-committed patient. JA 225. But here, the Department of Behavioral Health's Chief Nurse Executive, not the Department of Corrections, adopted the restraint policy. JA 147; *see also Beaulieu*, 690 F.3d at 1032-33 (finding that full-restraint policies are commonly used to transport civil detainees).

## IV. The Restraints Were Justified Under *Youngberg*

To show that the restraint policy violated the Constitution under *Youngberg*, Harris must prove that it was not an exercise of "professional judgment." *Youngberg*, 457 U.S. at 323. There are two ways to do that. First, he could demonstrate that the policy was not "made by a professional." *Id.* Second, even if it was made by a professional, he could show that the policy was "such a substantial departure from accepted professional judgment, practice, or standards . . . that the person responsible actually did not base the decision on such a judgment." *Id.*

Harris fails to do either.

---

[2] Though we have significant qualms about how the Department's policy was applied at Harris's hearing — court staff should not need to help a patient hold up his pants — that does not make the Department of Behavioral Health's general policy unconstitutional. Why the court permitted the proceeding to continue without recessing to allow Harris to appear before it fully clothed and without assistance is inexplicable.

First, the policy was "made by a professional." *Id.* The Department of Behavioral Health's Chief Nurse Executive approved the hospital's policy of having detainees transported in full restraints by the Department of Corrections. JA 147. She is a registered nurse with a PhD and has experience in hospital administration, so she is "competent . . . by education, training [and] experience" to make decisions about patient safety during transport. *Youngberg*, 457 U.S. at 323 n.30.[3]

Second, the policy was not a "substantial departure" from the "practice[s] or standards" for transporting civilly-committed patients. *Id.* at 323. As we have already noted, the Government's expert said the policy reflects "basic correctional principles and techniques" and "utilize[s] the same basic escort restraint procedures" as other law-enforcement agencies nationwide. JA 508-09 (declaration of Roy Gravette).

No evidence rebuts that testimony. Harris's expert conceded that he was not qualified "to offer an opinion on th[e] technical issues" involved in "transporting inmates." JA 482. He instead opined that the use of restraints "represents a substantial deviation from typical *medical* judgment." *Id.* (emphasis added).

But the Nurse Executive was entitled to consider security in her decision about the transport-restraint policy. *See Youngberg*, 457 U.S. at 324 (the government may "restrain

---

[3] At one point in his briefing, Harris suggested that he is not challenging the *policy* writ-large, but instead line-level correctional officials' decision to restrain him — and that those officers are not professionals who get deference under *Youngberg*. Harris Br. 21-23. But Harris backed away from that point at argument, clarifying that he was aggrieved by a "blanket . . . policy" that subjected him to restraints even though he "did not pose a risk of danger or elopement." Oral Arg. Tr. 6.

residents . . . when . . . necessary to assure . . . safety"); *Beaulieu*, 690 at 1033 (a restraint policy was a reasonable exercise of professional judgment under *Youngberg* where it was adopted "for the safety of the public and staff and to prevent escapes").

So even if Harris shows that the Nurse Executive's decision was not the best *medical* decision, he does not show that it was a "substantial departure from accepted professional judgment," because hospital administrators like the Nurse Executive may base their judgments on security concerns as well as medical ones. *Youngberg*, 457 U.S. at 323.

Because Harris offers no evidence to show that the policy was a substantial departure from accepted standards for transporting civilly-committed patients, his claim under *Youngberg* fails.

*So ordered.*