# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued January 6, 2020          Decided July 31, 2020

No. 18-7151

MICHELLE THOMPSON, PERSONAL REPRESENTATIVE OF THE
ESTATE OF JAMES ALLEN THOMPSON, JR.,
APPELLANT

v.

DISTRICT OF COLUMBIA, ET AL.,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 1:97-cv-01015)

*S. Micah Salb* argued the cause and filed the briefs for
appellant.

*Mary L. Wilson*, Senior Assistant Attorney General, Office
of the Attorney General for the District of Columbia, argued
the cause for appellees. With her on the brief were *Karl A.
Racine*, Attorney General, *Loren L. AliKhan*, Solicitor General,
and *Caroline S. Van Zile*, Deputy Solicitor General.

Before: MILLETT, PILLARD, and WILKINS, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* MILLETT.

MILLETT, *Circuit Judge*: In 1996, Frederick King, Executive Director of the District of Columbia Lottery and Charitable Games Control Board ("Lottery Board"), took a series of personnel actions designed to push his employee, James A. Thompson, Jr., out of his job without due process. In 1997, Thompson filed this suit against the District of Columbia under 42 U.S.C. § 1983, seeking compensation for King's violation of his Fifth Amendment rights.

We hold that the district court erred in denying Thompson's motion for summary judgment and granting summary judgment against Thompson on the ground that the District was not itself liable for King's constitutional tort. King was acting as a final policymaker on behalf of the District when he took the series of personnel actions that led to Thompson's constructive termination without due process. As such, the District is liable for King's wrongdoing. We remand for the district court to enter summary judgment against the District on the liability issue and, at long last, to determine the appropriate amount of damages.

**I**

**A**

James A. Thompson, Jr., was hired by the Lottery Board as an auditor in 1985. He came aboard as an experienced auditor and security systems expert, having previously served as the Chief of the Financial Division of the Metropolitan Police Department for several years. In 1996, after a series of promotions, Thompson was named the Lottery Board's Security Systems Administrator. That meant that he was tasked with reviewing and ensuring the integrity of the Lottery Board's operations.

Thompson's relationship with his superiors quickly began to sour "when several audits he supervised unearthed what he thought was unethical, if not illegal, behavior" at the Lottery Board. *Thompson v. District of Columbia* (*Thompson III*), 832 F.3d 339, 341 (D.C. Cir. 2016).

For example, in a February 1996 audit, Thompson discovered that the Lottery Board had purchased computer equipment for almost $7 million from a subcontractor, only to place the equipment on a depreciation schedule that labeled it worthless just five years later. Then, as part of a new purchase agreement, Lottery Board officials gave the rather expensive computer equipment back to the same subcontractor—at no cost to the subcontractor—despite the fact that "the equipment likely had at least some monetary value due to recent upgrades." *Thompson III*, 832 F.3d at 342. Thompson described the business arrangement as "unethical at the best[,]" and perhaps "a misappropriation of government assets, at worst." *Id.* He added that his concerns comported with news reports of other acts of misappropriation and fraudulent procurement activities at the Lottery Board. *Id.*[1]

Throughout the summer of 1996, Thompson repeatedly raised his concerns about the Lottery Board's questionable practices with his supervisor, Frederick King, the Lottery Board's Executive Director. But King refused to investigate.

---

[1] A later external investigation by the District's Financial Responsibility and Management Assistance Authority confirmed that "the contracting practices of the Lottery [Board] raised serious questions of propriety and conflict of interest." *Thompson III*, 832 F.3d at 342 n.1 (formatting modified). The Lottery Board was subsequently forced to revise one of its "major contracts." *Id.* (internal quotation marks omitted).

4

Instead, King took a series of adverse personnel actions that, in short order, left Thompson without his job.

First, on August 22, 1996, King used temporary authority granted to him amidst a District budget crisis to designate a vacant Security Officer position for elimination. Specifically, King turned to the Budget Support Temporary Act of 1995, which created a reduction-in-force protocol that, as relevant here, empowered "each agency head * * * to identify positions for abolishment," D.C. CODE § 1-625.5(a) (Supp. 1998), and then granted "each personnel authority" the power to "make a final determination that a position within the personnel authority is to be abolished," *id.* § 1-625.5(b).[2] As the Executive Director of the Lottery Board, King was both the "agency head" and the "personnel authority" for all Lottery Board employees (other than himself, obviously, and the Deputy Director of the Board). *Id.* § 1-603.01(11) (defining "agency head" as the highest ranking executive official of an agency"); *id.* § 1-604.6(b)(14) (naming the Executive Director as the Lottery Board's personnel authority).

Second, on the next day, August 23rd, King transferred Thompson from his Security Systems Administrator position "to the doomed [Security Officer] position." *Thompson III*, 832 F.3d at 342. Thompson was given neither notice of the transfer nor an opportunity to challenge it. *Id.* And the personnel form that King signed in making the reassignment said "only that the action fixed 'a classification error.'" *Id.*

---

[2] "A reduction in force is a 'reduction in personnel caused by a lack of funding or the discontinuance or curtailment of a department, program or function of an agency' that has no 'punitive or corrective' role." *Thompson III*, 832 F.3d at 342 n.2 (quoting *Davis v. University of D.C.*, 603 A.2d 849, 852 n.8 (D.C. 1992)).

Third, four days later (August 27th), King informed Thompson that his new position had been eliminated in the reduction in force. *Thompson III*, 832 F.3d at 342. King handed Thompson "a personnel form explaining that he would be removed from service in 30 days and that he had a right to appeal that separation to the District's Office of Employee Appeals." *Id.* As our court has stressed, "the form made no mention of Thompson's *prior* reassignment to the position that had been marked for elimination[,]" and so "did not inform Thompson of any right he might have had to challenge *that* employment action." *Id.*

Later that same day, King placed Thompson on paid leave for the next several weeks. Thirty days later, Thompson's new position was formally terminated as part of the reduction in force. *See* D.C. CODE § 1-625.5(f) (Supp. 1998). On September 30, 1996, Thompson briefly returned to work in a temporary position. But that position expired in January 1997, again leaving Thompson without a job at the Lottery Board— this time for good.

Shortly thereafter, the Lottery Board hired a new security manager. *Thompson III*, 832 F.3d at 342.

**B**

In May 1997, Thompson filed this suit under 42 U.S.C. § 1983, alleging, as relevant here, that the District of Columbia denied him his Fifth Amendment right to due process prior to his termination from the Lottery Board.

Seven years later, the district court granted the District's motion for judgment on the pleadings, ruling that the allegations in the amended complaint showed that Thompson had received due process through the District's grievance

procedures. *Thompson v. District of Columbia*, No. 1:97-01015-TPJ, 2004 WL 5348862, at *4 (D.D.C. June 23, 2004).

We reversed. *Thompson v. District of Columbia* (*Thompson I*), 428 F.3d 283 (D.C. Cir. 2005). We held that Thompson had stated a legally viable claim under the Fifth Amendment's Due Process Clause by alleging that King intentionally transferred him without notice or a pre-transfer hearing to a position that he knew would be eliminated imminently in the reduction in force. *Id.* at 288.

Two years later, the district court again dismissed Thompson's case. *Thompson v. District of Columbia*, 478 F. Supp. 2d 5 (D.D.C. 2007). With respect to Thompson's due process claim, the district court ruled that Thompson had no protected property interest in his job at the time of his termination because District of Columbia law had converted all Lottery Board personnel to at-will employees in September 1996. *Id.* at 9–10.

We reversed. *Thompson v. District of Columbia* (*Thompson II*), 530 F.3d 914 (D.C. Cir. 2008). To start, there was no dispute that Thompson was not an at-will employee throughout most of his time at the Lottery Board because the District of Columbia's Comprehensive Merit Personnel Act ("CMPA") provided he could be "removed from the Service only for cause and only in accordance" with the provisions of the CMPA. *Id.* at 918 (quoting D.C. CODE § 1-617.1(b) (1981)) (emphasis omitted); *see also id.* (explaining that Thompson had a property interest in his job if, "under District of Columbia law, he did not serve in his job at his employer's will, but he could be removed only for cause") (internal quotation marks omitted). We then held that it was irrelevant whether District of Columbia law changed Thompson's status to at-will in September 1996 because he was "constructively

removed from the Service at the time of [his] transfer" in August 1996. *Id.* at 919. Because "Thompson was a Career Service employee" removable only for cause at the time King "transferred him to a doomed position in order to get rid of him," Thompson had been deprived of his property interest in his job. *Id.* at 920.

Six and a half years later, the district court *sua sponte* dismissed Thompson's action, this time in a minute order. *See Thompson III*, 832 F.3d at 343–344. The district court later filed a written order concluding that "there are no legally available damages for" Thompson's due process claim. *Thompson v. District of Columbia*, No. 1:97-cv-01015-RJL, 2015 WL 13673454, at *1 (D.D.C. Feb. 18, 2015). The court reasoned that Thompson could not recover compensatory damages for his termination unless he could show that he would not have been terminated had he been given due process, and that Thompson had made no such showing.

We reversed. *Thompson III*, 832 F.3d at 341. We treated the district court's dismissal as a *sua sponte* entry of summary judgment because it went beyond the pleadings.

Before addressing the legal question whether damages were available, we rejected two attempts by the District to relitigate whether Thompson's due process rights were violated.

First, the District asked us to "revisit our conclusion in *Thompson II* that Thompson was deprived of his property interest at the time of his assignment to the [doomed] Security Officer position." *Thompson III*, 832 F.3d at 344. The District argued that "a reasonable juror could question whether the Lottery's employment action was a 'transfer' and instead conclude" that it was merely a reclassification that did not "trigger[] any process" under the CMPA. *Id.* at 344–345; *see*

CMPA, D.C. CODE § 1-617.1(b) (Replacement 1992) (applying process protections to Career Service Employees when they are "suspended for more than 30 days, reduced in rank or pay, or removed from the Service"); *id.* § 1-606.4(b) (requiring District of Columbia agencies to give written notice "prior to the taking of any action which adversely affects an employee"); *see also Thompson III* Oral Arg. Rec. 41:46–42:00 (District arguing that Thompson was merely "reclassified" and not meaningfully transferred because his job duties and description did not change); *id.* at 48:33–50 (District arguing that Thompson's "job title was clarified," and that he was not "terminat[ed]" at the time of the transfer). That argument, we held, rested "on a distinction without a difference." *Thompson III*, 832 F.3d at 345. Whether called a transfer or a reclassification, King's collective actions amounted, as a matter of law, to a constructive termination "because the Security Officer position had already been slated for elimination" at the time of the transfer. *Id.*

Second, we rejected the District's alternative argument "that Thompson received all of the process that he was due" because he was given a "right to challenge the elimination of his *new* position in the reduction in force." *Thompson III*, 832 F.3d at 345. The hearing that the District "offered Thompson to challenge the elimination of the Security Officer position did not give him a meaningful opportunity to contest the prior constructive termination"—the transfer into the ill-fated position—"because Thompson was never notified that he could challenge *that* action." *Id.* at 345–346 (emphasis added). Thompson had "a right to notice of [the] transfer and a hearing to challenge his transfer before it was made." *Id.* at 345. He was denied that process. *Id.*

On the question of damages, we agreed with the district court that Thompson could not recover compensatory damages

arising from his termination if it would have occurred even had he been given due process. *Thompson III*, 832 F.3d at 346. But we disagreed that it was Thompson's burden to prove this counterfactual point. *Id.* Rather, we held that, "[o]nce a plaintiff establishes that he was terminated without due process and demonstrates damages arising from that termination, the defendant is responsible for those damages unless the *defendant* shows they would have occurred regardless." *Id.* (citing *Brewer v. Chauvin*, 938 F.2d 860, 864–865 (8th Cir. 1991) (en banc)). Yet the District had failed as a matter of law to carry that burden. *Id.* at 347. So we instructed the district court on remand to enter partial summary judgment for Thompson as to the violation of his due process rights. *Id.*

We noted that only two issues remained for the district court to address on this third remand: (i) whether the District itself could be held liable for King's constitutional violation; and, if so, (ii) what damages it owed Thompson for the wrongdoing. *Thompson III*, 832 F.3d at 341.

The liability issue, we noted, hinged on *Monell v. Department of Social Services*, 436 U.S. 658 (1978), which ruled that a municipality is liable under 42 U.S.C. § 1983 only for constitutional violations caused by its policies or customs. *Thompson III*, 832 F.3d at 347. *Monell* established that "a municipality cannot be held liable *solely* because it employs a tortfeasor"—that is, "on a *respondeat superior* theory." *Id.* (quoting *Monell*, 436 U.S. at 691). Rather, the injury must "be inflicted by municipal 'lawmakers or by those whose edicts or acts may fairly be said to represent official policy.'" *Id.* (quoting *Monell*, 436 U.S. at 694). We emphasized that a "single action can represent municipal policy where the acting official has final policymaking authority over the 'particular area, or * * * particular issue.'" *Id.* at 347–348 (quoting *McMillian v. Monroe County*, 520 U.S. 781, 785 (1997))

(citing *City of St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988) (plurality opinion)); *see also Jett v. Dallas Indep. School Dist.*, 491 U.S. 701, 737 (1989) (*Monell* liability attaches where the offending official has "final policymaking authority for [the municipality] concerning the action alleged to have caused the particular constitutional or statutory violation at issue.").

With that framework in mind, we ruled that the District was liable under *Monell* for Thompson's termination "if King was a final policymaker for Lottery personnel decisions at the time of the reduction in force that cost Thompson his job." *Thompson III*, 832 F.3d at 348.

We then "conclude[d] there [was] significant reason to believe that King *was* a final policymaker with regard to the types of Lottery personnel decisions that led to Thompson's constructive termination." *Thompson III*, 832 F.3d at 349.

An official assuredly acts as a final policymaker, we noted, if his or her decisions are unconstrained by policies enacted by others and are unreviewable by other policymakers of the municipality. *See Thompson III*, 832 F.3d at 348. Here, we added, the reduction-in-force statute gave King "absolute discretion to identify positions for abolishment * * * at the time of Thompson's constructive termination[,]" notwithstanding any other provision of law. *Id.* at 349 (formatting modified). The law also cemented as "*final*" King's determination that a Lottery Board position be terminated. *Id.* (quoting D.C. CODE § 1-625.5(b) (Supp. 1998)). That meant that the law "expressly exempted King from the ordinary requirements of the CMPA in making [those] decisions," including the requirement to provide due process. *See id.* at 350.

In addition, we observed, the record was "replete with evidence that King" in practice "exercised his authority over personnel matters without any control by other District

officials." *Thompson III*, 832 F.3d at 349. King himself "testified that no one supervised his decisions about personnel actions," and he admitted "that he alone drew up the list of positions to be terminated, moved employees around to avoid adverse repercussions from the reduction in force, and decided on the number and types of employees who should be eliminated." *Id.* All that was critical, we explained, because "the law is concerned not with the niceties of legislative draftsmanship but with the realities of municipal decisionmaking, and any assessment of a municipality's actual power structure is necessarily a * * * practical one[.]" *Id.* (quoting *Praprotnik*, 485 U.S. at 145 (Brennan, J., concurring in the judgment)); *see also id.* at 350 ("[T]he existence of written policies of a defendant are of no moment in the face of evidence that such policies are neither followed nor enforced.") (quoting *Ware v. Jackson County*, 150 F.3d 873, 882 (8th Cir. 1998)).

"Read together," we stressed, "the D.C. Code and King's testimony indicate that King's [personnel] decisions" that resulted in Thompson's constructive termination without due process "were not in fact reviewed" by anyone. *Thompson III*, 832 F.3d at 350. But because neither party had fully briefed the *Monell* issue, we remanded so the district court could resolve it in the first instance. *Id.* at 351.

## C

On remand, Thompson moved for summary judgment regarding the District of Columbia's liability under *Monell*. In December 2017, following a failed attempt at mediation, the district court denied Thompson's fully briefed summary judgment motion in a minute order.

Thompson then filed a motion seeking reassignment of his case to a judge whose docket did not foreclose a prompt trial

date. The district court promptly scheduled a status conference. Thompson then filed a motion asking the district court to explain why it denied his summary judgment motion.

On February 1, 2018, the district court denied in a minute order Thompson's motion for a statement of reasons regarding its denial of his summary judgment motion. In the minute order, "[p]ursuant to the agreement of the parties at the 1/29/18 conference," the district court also set a briefing schedule for the District to file a summary judgment motion of its own on the issue of *Monell* liability. Minute Order, *Thompson*, No. 1:97-cv-01015-RJL (D.D.C. Feb. 1, 2018).

The District of Columbia subsequently filed a motion for summary judgment, which the district court granted, holding that the District was not liable under *Monell* for King's actions. *Thompson v. District of Columbia*, No. 1:97-01015-RJL, 2018 WL 4705787 (D.D.C. Sept. 30, 2018). The court concluded that neither District policy nor custom was the moving force behind the violation of Thompson's right to due process. King, and only King, was responsible for his actions.

In so ruling, the court rejected Thompson's three independent theories of *Monell* liability.

First, the district court ruled that King was not acting as a final policymaker for the District when he reassigned Thompson to the Security Officer position on the eve of its elimination. The court considered it irrelevant whether King was a final policymaker when he "took the separate and distinct employment action of including the position (and Thompson) in the [reduction in force]—a decision regarding which Thompson did receive notice and an opportunity to challenge." *Thompson*, 2018 WL 4705787, at *5.

The district court then concluded that, while the reduction-in-force statute vested King with unencumbered authority to identify positions for termination, the statute did not grant him the same unencumbered authority to transfer Thompson into a different position without first providing him due process. For that reason, the district court concluded that King was not a final policymaker unbounded by the "constraints and requirements imposed by other personnel laws." *Thompson*, 2018 WL 4705787, at *5. Specifically, the D.C. Code mandated that King exercise his personnel authority "in accordance with the [CMPA]," the law under which Thompson argued that he was denied due process regarding the transfer. *Id.* (quoting D.C. CODE § 2-2503 (1981)). "[T]he CMPA should have afforded [Thompson] [procedural] protections," the district court reasoned, because his "reassignment amounted to a constructive removal[.]" *Id.* at *6; *see also* CMPA, D.C. CODE § 1-606.4(b) (Replacement 1992) (mandating written notice "prior to the taking of any action which adversely affects an employee"). So, the district court concluded, the CMPA—not King's departure from it— represented the District's settled policy. The district court added that the D.C. Code also left King's general power to "[e]mploy other assistants and employees" "subject to the direction and supervision of the [Lottery] Board." *Id.* at *7 (quoting D.C. CODE § 2-2503 (1981)). So any authority King had over transfers was non-final too.

Second, in a footnote, the district court rejected Thompson's alternative liability argument that the District ratified King's unlawful action by affirmatively approving both King's decision and the basis for it. According to the district court, Thompson failed to identify any evidence in the record supporting that contention.

Third, the district court rejected Thompson's argument that "King acted pursuant to a 'custom' that, while not 'formally approved by an appropriate decisionmaker,' subjects the District 'to liability on the theory that the relevant practice is so widespread as to have the force of law.'" *Thompson*, 2018 WL 4705787, at *8 (quoting *Board of County Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 404 (1997)). According to Thompson, the District had a settled "municipal custom of retaliating" against employees, and that custom was the moving force behind his unconstitutional termination. *Id.* But the court held that Thompson failed to identify "specific facts showing a genuine triable issue as to whether the District had a widespread and pervasive custom or practice of denying procedural due process" to its employees. *Id.*

Thompson died while this latest round in his action was pending. We substituted his daughter, Michelle Thompson, as the plaintiff in the case in her capacity as personal representative of her father's estate. Michelle Thompson appeals the district court's denial of plaintiff's motion for summary judgment and its entry of summary judgment in favor of the District.

**II**

The district court had jurisdiction under 28 U.S.C. § 1331. Our jurisdiction arises under 28 U.S.C. § 1291.

We review *de novo* a district court's grant or denial of summary judgment. *Defenders of Wildlife v. Zinke*, 849 F.3d 1077, 1082 (D.C. Cir. 2017). "We view the evidence in the light most favorable to the party opposing summary judgment, draw all reasonable inferences in that party's favor, and avoid weighing the evidence or making credibility determinations." *Thompson III*, 832 F.3d at 344. Summary judgment is appropriate only "if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). There is a genuine issue of material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Whether a particular official has final policymaking authority for purposes of *Monell* liability is a question of state law, and "the identification of those officials whose decisions represent the official policy of the local governmental unit is itself a legal question to be resolved by [the court]." *Jett*, 491 U.S. at 737.

## III

### A

Michelle Thompson primarily argues that the district court erred in holding that *Monell* insulated the District from liability for the personnel actions that King took to effect Thompson's termination. Although she advances three alternative theories of District liability, we need only consider her first theory because it suffices to establish the District's responsibility for King's actions.

Specifically, even taking the facts in the light most favorable to the government, the record in this case shows that King was acting as a final policymaker on behalf of the District when he made "the types of Lottery personnel decisions that led to Thompson's constructive termination" without notice or a pre-termination hearing. *Thompson III*, 832 F.3d at 349. The District empowered King to make the final policy judgments for developing and carrying out the reduction in force at the Lottery Board, and he used that authority to take the personnel measures that constructively terminated Thompson without

due process. His relevant personnel decisions were (i) unconstrained "by policies enacted by others," and (ii) unreviewable by any other authorized policymaker. *See id.* at 348. So the District is liable for them under *Monell*.

Recall that King took three personnel actions that resulted, as a matter of law, in Thompson's constructive termination without notice or a pre-termination hearing.

First, he designated a vacant Security Officer position for elimination. Second, he transferred Thompson into that condemned position, with no notice or pre-termination opportunity to challenge the transfer, let alone warning that the position was on the verge of elimination. Third, King promptly eliminated Thompson's new position. The parties agree that it was "the totality" of these actions that resulted in Thompson's constructive termination. District Br. 22; Thompson Br. 11.

The District does not dispute that King was acting as a final policymaker, within the meaning of *Monell*, when he took the first and third of those actions. *See* Oral Arg. Tr. 26:16–27:20. For good reason. King's designation of the Security Officer position for elimination, and his subsequent elimination of that position, were both undertaken as part of King's administration of the reduction in force. And the reduction-in-force statute specifically empowered King, "[n]otwithstanding *any other provision of law*," to "make a *final* determination that a position * * * be abolished." D.C. CODE § 1-625.5(a)–(b) (Supp. 1998) (emphasis added). The statute also left any individual in such a fated position without a job, "[n]otwithstanding any rights or procedures established by any other provision of" the CMPA. *Id.* § 1-625.5(c). As the District put it, the statute gave King "absolute discretion" in carrying out the reduction in force. Oral Arg. Tr. 26:8–12.

That is the stuff of which final policymakers are made. *See Thompson III*, 832 F.3d at 348.

The District likewise agrees that the CMPA did not in any way constrain King's ability *generally* to transfer or reclassify employees without pre-transfer notice or a hearing, as long as the transfer did not amount to a demotion or a constructive termination. *See* Oral Arg. Tr. 28:17–29:2. Nor has the District denied that, in implementing the reduction in force, King transferred or reclassified employees into different positions solely to alter the reduction-in-force consequences that they otherwise would face. *See* Oral Arg. Tr. 37:3–15 (Q: "And you haven't disputed for the district court or this Court that [King] was [moving employees to insulate them from the reduction in force], have you?" A: "I don't think we've disputed that."). King, in fact, admitted that he "moved employees around to avoid adverse repercussions from the reduction in force," and "that no one supervised his decisions about personnel actions[.]" *Thompson III*, 832 F.3d at 349.

Against that backdrop, the District's central contention is that King lacked the policymaking authority to constructively terminate Thompson because his transfer of Thompson into a position slated for elimination violated the CMPA. In other words, the District does not dispute that King was unconstrained by the CMPA for each of the three independent steps that added up to Thompson's constructive removal. But, the District argues, because this court later concluded that the cumulative impact of those measures amounted, as a matter of law, to a constructive termination requiring pre-transfer process under the CMPA, King violated the District's "established policy" (by virtue of the CMPA) that pre-transfer process was required. District Br. 12, 25.

That argument fails at multiple levels.

For starters, the issue for *Monell* purposes is not whether King had the policymaking authority to constructively terminate Thompson by way of the transfer. "Constructive termination" is a legal label that we ascribed twelve years after the fact to the series of personnel decisions King made that ousted Thompson from his job. *See Thompson II*, 530 F.3d at 919 ("We hold that when an employer attempts to get rid of an employee by transferring him from a Career Service position to a job already scheduled for imminent elimination pursuant to an otherwise legitimate [reduction in force], the employee is constructively removed from the Service at the time of the transfer."); *see also Simpson v. Federal Mine Safety & Health Review Comm'n*, 842 F.2d 453, 461–462 (D.C. Cir. 1988) (explaining the "[c]onstructive discharge doctrine").

Instead, as we explained in *Thompson III*, the question of *Monell* liability in this case turns on whether "King was a final policymaker with regard to the *types* of Lottery personnel *decisions* that led to Thompson's constructive termination." *Thompson III*, 832 F.3d at 349 (formatting modified); *see also id.* at 350 ("In fact, the District seems to have expressly exempted King from the ordinary requirements of the CMPA in making *these decisions*.") (emphasis added).

The proof is all over our prior opinion. We spilled a great deal of ink in *Thompson III* on King's authority under the reduction-in-force statute as it relates to *Monell* liability. *See, e.g.*, 832 F.3d at 350 ("King's personnel policies also seem to have been removed from the ordinary rules of oversight that the District points to as evidence that the Board maintained the ability to direct and supervise King's personnel decisions.") (citing reduction-in-force statute, D.C. CODE § 1-625.5(g) (Supp. 1998)); *id.* ("In fact, the District seems to have expressly exempted King from the ordinary requirements of the CMPA in making these decisions.") (citing reduction-in-force statute,

D.C. CODE § 1-625.5(a), (c) (Supp. 1998)); *id.* at 349 ("We have already recognized that King had absolute discretion to identify positions for abolishment for the purposes of the reduction in force at the time of Thompson's constructive termination. The D.C. Code further provided that King would make a *final* determination that a position within the [Lottery Board] is to be abolished.") (formatting modified).

As we also explained, the *Monell* analysis focuses on *each* of King's three personnel decisions for good reason: King's selection and elimination of the Security Officer position in the reduction in force were constituent elements of the constructive termination of Thompson without due process. The three steps were not unrelated happenstance; they were choreographed by King to work in tandem. Like Casey at the Bat, it took all three strikes to get Thompson out.

The effort to separate the transfer from the selection and elimination of the Security Officer position—and then ask this court to ignore King's authority over everything but the transfer—is also illogical on this record. That is because King's exercise of his authority to implement the reduction in force undisputedly included "mov[ing] employees around" to manipulate the effects of the force reduction on individuals. *Thompson III*, 832 F.3d at 349. As King himself admitted, no one supervised those transfer decisions. *See id.*

In any event, even were we to look only at King's transfer authority, that would not change anything. Critical to the District's argument on the transfer front is that it had an "established policy" requiring King to provide pre-transfer process under the CMPA if the transfer amounted to a constructive termination. *See* District Br. 12, 25. But saying it does not make it so.

First, recall that for twenty years after Thompson's fateful transfer—continuing through his last appeal—the District argued exactly the opposite. It contended that, under District law, the transfer was a mere administrative reclassification that did not require any pre-transfer process under the CMPA. Which left the reclassifying transfer fully within King's unilateral authority. *Thompson III*, 832 F.3d at 344–345; *Thompson III* Oral Arg. Rec. 41:46–42:01 (arguing that Thompson was merely "reclassified" and not meaningfully transferred because his job duties and description did not change); *id.* at 48:33–50 (arguing that Thompson's "job title was clarified," and that he was not "terminat[ed]" by the transfer). While parties are, of course, free to change their arguments as cases proceed, they cannot change legal reality after the fact.

Second, the District does not point to anything corroborating its current contention that it had an established policy in 1996 of providing pre-transfer process under the CMPA for this sort of mid-reduction-in-force transfer. It has not cited a single example of an employee receiving pre-transfer process in an analogous circumstance. Instead, the District points to *Levitt v. District of Columbia Office of Employee Appeals*, 869 A.2d 364 (D.C. 2005). District Br. 30 n.13; Oral Arg. Tr. 37:17–38:21. But *Levitt* did not hold that the CMPA required any such pre-transfer process. It held only that an employee challenging his termination in a reduction in force, who was transferred several times before his final position was eliminated, raised non-frivolous arguments concerning "the unusual personnel actions the employing agency took before abolishing his position" that warranted further examination after the fact. *See Levitt*, 869 A.2d at 366–367 (emphasis omitted). The case says nothing about *pre*-transfer process under the CMPA or otherwise. Nor does it

evidence an established policy of the kind described by the District now.

The District's failure to back up its contention that it had an "established policy" in 1996 of mandating pre-transfer notice under the CMPA if the transfer resulted in a constructive termination closes the door on its argument that King was simply a rogue tortfeasor. *See Thompson III*, 832 F.3d at 350 ("[T]he existence of written policies of a defendant are of no moment in the face of evidence that such policies are neither followed nor enforced.") (quoting *Ware*, 150 F.3d at 882); *id.* (noting a mere "paper policy cannot insulate a municipality from liability where there is evidence * * * that the municipality was deliberately indifferent to the policy's violation") (quoting *Daskalea v. District of Columbia*, 227 F.3d 433, 442 (D.C. Cir. 2000)).

Alternatively, the District argues that the Lottery Board's Human Resources Division—not King—was responsible for providing Thompson with pre-transfer notice and an opportunity to be heard. District Br. 21–22 ("King could not make a policy decision binding on the District to deprive Thompson of process that King did not have the responsibility to provide in the first place."). But that argument ignores the fact that King manipulated the personnel forms by stating that the transfer merely fixed a classification error. *See id.* That was not Human Resources' doing.

Besides, to provide pre-transfer process, Human Resources would have to have been informed in advance by King that, although the transfer looked like a series of authorized reduction-in-force personnel decisions, it really was a plan to accomplish a constructive termination. There is no evidence that King told anyone in Human Resources what he was up to.

Finally, the District argues that, apart from the CMPA, the D.C. Code also made King's transfer decisions "subject to the direction and supervision of the [Lottery] Board." District Br. 31 (internal quotation marks omitted); D.C. CODE § 2-2503(d) (Replacement 1994). As the District would have it, the Lottery Board's supervisory power over King made the Board, not King, the final policymaker when it came to constructive terminations during the reduction in force.

That argument seeks to fight lost battles. We have already held that the *Monell* analysis requires us to look at the full panoply of personnel decisions that King made to constructively terminate Thompson without due process during the reduction in force. *See Thompson III*, 832 F.3d at 349–350. As to those decisions—the very decisions at issue in this case— the D.C. Code empowered King to make final and unreviewable decisions about which positions would be abolished. *See* D.C. CODE § 1-625.5(a)–(b) (Supp. 1998) (vesting in King, as "personnel authority," the power to "identify positions for abolishment" and "make a final determination that a position * * * be abolished"). The Lottery Board had no role to play. King "alone" moved employees around to manipulate the consequences of those decisions, with "no one supervis[ing] [those] personnel actions[.]" *Thompson III*, 832 F.3d at 349. The District's argument depends entirely on divorcing Thompson's transfer from its accompanying reduction-in-force personnel decisions and from the realities of municipal decisionmaking. *Monell* does not require us to blink away reality. *See id.* (*Monell* analysis "is concerned not with the niceties of legislative draftsmanship but with the realities of municipal decisionmaking, and any assessment of a municipality's actual power structure is necessarily a * * * practical one.").

Because the record in this case demonstrates that King had the sole and unreviewable authority to make the series of personnel decisions, including the transfer, that together amounted to Thompson's constructive termination without due process, he was a final policymaker for the District within the meaning of *Monell*. For that reason, the district court is directed to enter summary judgment in favor of Michelle Thompson on the question of *Monell* liability.[3]

**B**

In addition to seeking reversal of the district court's summary judgment ruling, Michelle Thompson requests that we reassign this case on remand to a different judge.

We declined this same request in our last decision. *Thompson III*, 832 F.3d at 351 (noting that "impartiality, the appearance of justice, and the possibility of waste and duplication are the three factors" governing reassignment requests) (citing *United States v. Wolff*, 127 F.3d 84, 88 (D.C. Cir. 1997)). Reassignment is "unusual" relief for the court to provide. *Wolff*, 127 F.3d at 88. The district court's handling of the case did not warrant it before. *See Thompson III*, 832 F.3d at 351. Nor does it now. The district court acted in a timely manner to address the *Monell* issue and its ultimate summary judgment decision was explained to the parties and

---

[3] Michelle Thompson separately argues that the district court committed reversible error in denying Thompson's motion for a statement of reasons regarding its minute-order denial of his motion for summary judgment on the issue of *Monell* liability. But the district court did eventually explain itself in a memorandum opinion when it granted summary judgment to the District. Anyhow, our decision on *Monell* liability obviates any need to address that procedural objection.

was thoughtful in its reasoning. This court's disagreement on the law says nothing about the district court's responsible execution of its duties.

That said, we are not unsympathetic to Michelle Thompson's concerns and frustration with how long this case has taken to resolve. Her father filed this suit twenty-three years ago. He unfortunately has not survived to see its resolution. Yet we remain confident that, as with the last remand, the district court will act expeditiously. *Thompson III*, 832 F.3d at 351. After all, only one issue remains to be resolved—a calculation of the damages owed by the District for King's violation of Thompson's due process rights. *See id.* at 341.

**IV**

For all of those reasons, the district court erred in granting summary judgment for the District of Columbia and in denying summary judgment for James and Michelle Thompson on the question of *Monell* liability. As a matter of law, King acted as a final policymaker when he took the series of personnel actions that resulted in Thompson's constructive termination without due process. That means that the District of Columbia is responsible for the wrong. We direct the district court to enter summary judgment for Michelle Thompson on the question of *Monell* liability, and we remand for further proceedings to determine the amount of damages owed, consistent with this opinion.

*So ordered.*