# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued November 16, 2020      Decided May 14, 2021

No. 20-7003

MICHAEL D. HURD, JR.,
APPELLANT

v.

DISTRICT OF COLUMBIA, GOVERNMENT,
APPELLEE

Appeal from the United States District Court
for the District of Columbia
(No. 1:15-cv-00666)

*Eric C. Rowe* argued the cause for appellant. With him on the briefs were *C. Allen Foster* and *Erik D. Bolog.*

*Caroline S. Van Zile*, Principal Deputy Solicitor General, Office of the Attorney General for the District of Columbia, argued the cause for appellee. With her on the brief were *Karl A. Racine*, Attorney General, *Loren L. AliKhan*, Solicitor General, *Carl J. Schifferle*, Deputy Solicitor General, and *Mary L. Wilson*, Senior Assistant Attorney General.

Before: SRINIVASAN, *Chief Judge*, HENDERSON and MILLETT, *Circuit Judges*.

2

Opinion for the Court filed by *Circuit Judge* MILLETT.

MILLETT, *Circuit Judge*:   This appeal is the result of a series of unfortunate events that left Michael D. Hurd, Jr. suddenly incarcerated for a sentence he believed he had already served and for which he had completed supervised release.  The narrow question in this case is whether Hurd has stated a claim that the District of Columbia itself can be held liable for his loss of liberty without due process.  Because the answer to that question turns on substantial questions of disputed fact, we hold that the district court erred in granting summary judgment for the District, and we remand for further proceedings.

**I**

**A**

In August 2005, Hurd, an honorably discharged veteran, was stopped while driving in the District of Columbia.  Hurd immediately informed the officer that he had a firearm in his glove compartment that he was licensed to carry in North Carolina.  Hurd's permit, however, did not license him to carry the firearm in the District of Columbia.  The District charged Hurd with carrying a firearm without a license, which at the time was a felony offense under D.C. CODE § 22-3204(a)(1) (1994) (codified as amended at D.C. CODE § 22-4504).

Following the arrest, police from the Metropolitan Police Department searched Hurd's residence in the District.  They found a small amount of cocaine and more firearms there.  The District then charged Hurd with four misdemeanors, in addition to the initial felony.  On January 23, 2006, Hurd pled guilty to all five charges—one count of carrying a pistol without a license, one count of possessing a prohibited weapon, two counts of possessing unregistered firearms, and one count of possessing cocaine.  At the sentencing hearing, the District of

Columbia Superior Court sentenced Hurd to a total of 45 months' imprisonment. The court, though, suspended Hurd's term of imprisonment and placed him on supervised probation. After a probation violation later that year, the court revoked Hurd's probation and ordered that he serve 42 months of imprisonment, followed by a three-year term of supervised release.

At the time of Hurd's sentence, the District of Columbia Department of Corrections and the Federal Bureau of Prisons had a policy under which people convicted in the District of felonies served their sentence in federal prison, while those convicted of misdemeanors served their sentence in the District jail. People who had both felony and misdemeanor sentences, like Hurd, commonly served their felony sentence first within the Federal Bureau of Prisons and, once that sentence was completed, served their remaining misdemeanor sentence in the District jail.

Hurd served his 15-month felony sentence in a federal prison in West Virginia. While he was there, Hurd wrote a letter to the court, requesting *pro se* that the court reduce his sentence by either allowing his misdemeanor sentences to run concurrently with his felony sentence or allowing him to serve the sentences on probation. While the district court denied Hurd's motion, it mailed the order to the District jail, rather than the prison in West Virginia. So Hurd was unaware that the court had denied his motion for sentence reduction.

Less than nine months after being sent to prison, the Bureau of Prisons released Hurd to the Hope Village Halfway House in the District of Columbia. Because he was not sent to a District jail to serve the misdemeanor sentence, Hurd concluded that his motion for sentence reduction must have been granted. Hurd served one month at the halfway house and

then was discharged to begin his period of supervised release.

During his period of supervised release, Hurd remained in the District of Columbia and regularly submitted to monitoring and drug tests. Hurd successfully completed his term of supervised release on July 18, 2010. For the entirety of those three years, "the conduct of the federal prison that released him, the halfway house where he lived during his first few weeks out of prison, the Parole Commission, and the Court Services and Offender Supervision Agency that regularly monitored him all reinforced Hurd's belief that he had been deliberately released from prison and had fully served his 2006 sentence[,]" including the misdemeanor components. *Hurd v. District of Columbia*, 864 F.3d 671, 676 (D.C. Cir. 2017).

In September 2011, Hurd pled guilty to possessing less than two ounces of marijuana and was sentenced to nine days in jail, to be served on weekends. Hurd served the first and second weekends of that sentence. But when he tried to leave the jail at the end of the second weekend, a Kafkaesque saga began.

The story starts with "legal instrument examiners," who are District employees whom the Department of Corrections tasks with reviewing an inmate's record and relevant databases "to determine if there are any outstanding warrants or charges" that should prevent the inmate's release from jail. J.A. 269. One of those examiners, Mark Sibert, concluded that Hurd had never completed the sentence for his 2006 misdemeanor convictions, and prevented Hurd's release after his second weekend sentence.

The examiner later emailed the Bureau of Prisons to ask why Hurd had been released in 2007 after completing only his felony sentence. Two weeks later, the Bureau responded that the paperwork it received on Hurd did not indicate that he was

supposed to be remanded to the District jail to serve additional time. *See* J.A. 250 (noting that the Custody and Detention Form showed that there was no "consecutive misdemeanor term"); *see also* J.A. 252. On October 26, 2011, the District's Department of Corrections emailed Hurd to advise him that he had been "erroneously release[d]" from federal prison in 2007 because he "also had a consecutive misdemeanor to serve." J.A. 185. In other words—four years after his release from prison, and after completing three years of supervised release—Hurd was told he would have to serve another 27 months in jail.

In November 2011, Hurd filed a writ of habeas corpus in the District of Columbia Superior Court. That court, though, did not hold a hearing on the petition until July 27, 2012. At that time, the court ruled from the bench that Hurd must "serve the remainder of his sentence[.]" J.A. 155. Hurd appealed. But the District of Columbia Court of Appeals did not act on Hurd's appeal until December 2013, at which point it dismissed the petition as moot because Hurd had been "released from [jail] on September 30, 2013, upon completion of his sentence." Order Sua Sponte Dismissing Appeal, *Hurd v. United States*, No. 12-CO-1364, slip op. at 1 (D.C. Dec. 18, 2013).

**B**

In May 2015, Hurd filed suit against the District under 42 U.S.C. § 1983, alleging that his spontaneous incarceration deprived him of due process under the Fifth Amendment to the United States Constitution. Complaint, *Hurd v. District of Columbia*, No. 15-cv-666-ESH (D.D.C. May 1, 2015), ECF No. 1. The district court dismissed the case on the ground that, as a matter of claim preclusion, Hurd's prior unsuccessful habeas corpus action barred him from relitigating the legality

of his incarceration in the Section 1983 lawsuit. *Hurd v. District of Columbia*, 146 F. Supp. 3d 57, 63–64 (D.D.C. 2015). The court also held that Hurd's surprise two-year incarceration violated neither substantive nor procedural due process protections. *Id.* at 64–72.

This court reversed. We first held that Hurd's prior habeas proceeding, which had become moot before his appeal was resolved, did not preclude Hurd's Section 1983 damages claim. *Hurd*, 864 F.3d at 679–680. We also held that Hurd had properly alleged a procedural due process claim because he possessed a liberty interest in not being incarcerated without warning. *Id.* at 683–684. We emphasized that the District's Department of Corrections had reincarcerated Hurd "without a warrant or a detainer despite the fact that the authority to detain him was statutorily committed to the Federal Bureau of Prisons." *Id.* at 684. "If Hurd had received notice and a hearing before his re-incarceration, he might have raised an *ultra vires* challenge to the District's authority to detain him." *Id.* We also held that the district court's substantive due process analysis was faulty in that it relied on material beyond the pleadings to determine that Hurd's incarceration could not have violated his substantive due process rights. *Id.* at 684–686.

On remand, following discovery, the district court granted summary judgment for the District. The court ruled that, even assuming Hurd could establish a violation of due process, Supreme Court precedent precluded holding the District liable for the actions of its employees in this case. *Hurd v. District of Columbia*, 427 F. Supp. 3d 21, 37 (D.D.C. 2019) (citing *Monell v. Department of Social Servs. of N.Y.*, 436 U.S. 658 (1978)). The court held, in particular, that the District's policy of checking inmate information before release could not trigger *Monell* liability because that policy did not itself violate the Constitution. *Id.* at 30. The court also ruled that Hurd had

failed to show that the District had an established custom of constitutional violations or acted with deliberate indifference to those violations. *Id.* at 30–37.

Hurd timely filed a notice of appeal.

## II

The district court had jurisdiction to hear this case under 28 U.S.C. § 1331. This court has jurisdiction under 28 U.S.C. § 1291.

We review the district court's decision granting summary judgment *de novo*. *Thompson v. District of Columbia*, 967 F.3d 804, 812 (D.C. Cir. 2020). In doing so, we view the evidence and reasonable inferences therefrom in the light most favorable to Hurd, as he was the party opposing summary judgment. *Id.* at 812–813.

## III

### A

In *Monell*, the Supreme Court held that, under 42 U.S.C. § 1983, municipalities can be held liable for constitutional violations committed by their employees only if a plaintiff shows that the municipality is the "moving force" behind the constitutional violation, meaning that an "official municipal policy of some nature caused a constitutional tort[,]" *Monell*, 436 U.S. at 691, 694. Generally speaking, such an official policy exists when (1) the municipality adopts a policy that itself violates the Constitution; (2) the unconstitutional action was taken by a "policy maker" within the government; (3) the employees' unconstitutional actions "are so consistent that they have become [a] 'custom'" of the municipality of which the supervising policymaker must have been aware; or (4) the

municipality knew or should have known of a risk of constitutional violations, but showed "deliberate indifference" to that risk by failing to act. *Baker v. District of Columbia*, 326 F.3d 1302, 1306 (D.C. Cir. 2003); *see City of St. Louis v. Praprotnik*, 485 U.S. 113, 130 (1988) (plurality opinion).

So to survive summary judgment, Hurd had to show that the District or one of its official policymakers directly violated the Constitution, allowed constitutional violations so widespread that they amounted to a municipal custom, or was deliberately indifferent to the risk of constitutional violations.

Hurd presents two theories for municipal liability. First, he argues that there has been a pattern of similar unconstitutional practices within the District's Department of Corrections, such that the District either tacitly adopted the employees' conduct as custom or was deliberately indifferent to the constitutional rights of detainees. Second, Hurd argues that the District's official detention policy violated his constitutional rights. Hurd's first theory of liability fails, but the second may succeed depending on as-yet unresolved factual determinations.[1]

---

[1] On appeal, Hurd also argued that the District conceded in its Answer to the Amended Complaint that "*it*" kept Hurd in jail in violation of his constitutional rights. Hurd did not make this argument before the district court, and he has made no similar argument at any time in the long history of this case. As a result, the argument is forfeited. *Keepseagle v. Perdue*, 856 F.3d 1039, 1053 (D.C. Cir. 2017) ("It is well settled that issues and legal theories not asserted at the District Court level ordinarily will not be heard on appeal.") (quoting *District of Columbia v. Air Fla., Inc.*, 750 F.2d 1077, 1084 (D.C. Cir. 1984)).

9

**B**

As to his first theory, Hurd argues that his sudden incarceration without due process was part and parcel of a "pattern of similar violations" by the District, and also showed the District's deliberate indifference to the constitutional rights of inmates eligible for release. Hurd Br. 43, 46. To make that showing, Hurd places great weight on two prior class actions—*Bynum v. District of Columbia*, 257 F. Supp. 2d 1 (D.D.C. 2002), and *Barnes v. District of Columbia*, 793 F. Supp. 2d 260 (D.D.C. 2011)—and claims that they "established [a] record of [the District] ignoring the constitutional rights of prisoners held in the D.C. Jail." Hurd Br. 43. Hurd adds that the testimony of one current employee and one former employee of the District's Department of Corrections supports his argument that the "chaos" involved in the District's prisoner-release procedures could have caused his incarceration. Hurd Br. 48–49.

Hurd's evidence fails to show either that the District had a relevant custom of unconstitutional actions or that the District acted with deliberate indifference.

**1**

To hold a municipality liable based on a pattern of similar constitutional violations, a plaintiff must show that the municipality "knowingly ignore[d] a practice that was consistent enough to constitute custom." *Warren v. District of Columbia*, 353 F.3d 36, 39 (D.C. Cir. 2004). The practice must be "persistent and widespread[.]" *Connick v. Thompson*, 563 U.S. 51, 61 (2011). And the actions or "series of decisions" can only confer liability on the municipality if the custom was so engrained that it amounted to a "standard operating procedure" of which municipal policymakers must have been aware. *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737

(1989); *see Praprotnik*, 485 U.S. at 127, 130 (plurality opinion) (holding that municipal liability could lie "if a series of decisions by a subordinate official manifested a 'custom or usage' of which the supervisor must have been aware").

Hurd did not come forward with summary judgment evidence demonstrating such a widespread practice or custom of spontaneous incarceration after a record review by legal instrument examiners (or by other District employees). *Bynum* and *Barnes* do not do the job for Hurd. Both cases involve failures by the District that bear little resemblance to the type of unconstitutional conduct asserted by Hurd. In both *Bynum* and *Barnes*, the plaintiffs challenged the District's release procedures for inmates who had concluded their sentences and alleged that the District's procedures delayed release and resulted in additional hours or a day of incarceration beyond the end of the imposed sentence. *See Bynum v. District of Columbia*, 412 F. Supp 2d 73, 77–78 (D.D.C. 2006) (defining the class of plaintiffs as "[e]ach person * * * who was not released, or, in the future will not be released by midnight on the date on which the person is entitled to be released by court order or the date on which the basis for his or her detention has otherwise expired"); *Barnes*, 793 F. Supp. 2d at 269, 271, 274, 278 (due process violated by unreasonably delayed release at the end of the sentence when, for example, inmates were made to stay an extra night in jail because of a District rule that forbade the release of incarcerated people between 10:00 PM and 7:00 AM).

Those constitutional violations involving the timing of inmate releases did not put District policymakers on notice of the type of incarceration problem at issue in Hurd's case. The over-detentions in *Barnes* and *Bynum* involved the delayed release of inmates who had fully served their sentences and as to whom the District asserted no lawful basis for any further

detention (*e.g.*, no claimed warrants, detainers, or unserved sentences). *See Barnes*, 793 F. Supp. 2d at 276; *Bynum v. District of Columbia*, 384 F. Supp. 2d 342, 348 (D.D.C. 2005). In contrast, Hurd asserts that the District intentionally incarcerated him for an unserved sentence for different offenses—his misdemeanor sentences—after he was mistakenly released from the halfway house four years earlier. Spontaneous incarceration for what is believed to be an unserved sentence is factually and legally distinct from an administratively delayed release at the completion of a sentence for which no lawful basis for further detention is claimed. The governmental activity giving rise to the constitutional claim, which here involved individual record assessments by District employees that led to incarceration for totally different crimes, is distinct from the bureaucratic misadministration of general inmate release protocols in *Bynum* and *Barnes*. More to the point, a District employee could hardly have looked at the conduct at issue in *Bynum* and *Barnes* as a "standard operating procedure" that caused Hurd's incarceration, *Jett*, 491 U.S. at 737.

Lastly, Hurd offered the testimony of two Department of Corrections employees to demonstrate the "chaos" that existed in the Department of Corrections' recordkeeping procedures. Specifically, Hurd points to the testimony of Mark Sibert (the legal instrument examiner who stopped his release) describing the complexity of the District's release procedures. J.A. 236. Hurd also relies upon the testimony of Michelle Waddy, a former legal instrument examiner, who quit because of "bad releases" by the Department of Corrections' record office. J.A. 466–467.

But none of that testimony demonstrated a pattern of constitutional violations pertaining to separate incarcerations based on records of unserved sentences. Waddy, for example,

quit her job because she felt the Department of Corrections was releasing people who *ought not* be released. And the multi-step complicated nature of the release procedures about which Sibert spoke had nothing to do with the District's deliberate incarceration of Hurd on a newly discovered unserved sentence.

**2**

Hurd also argues that the District was so deliberately indifferent to problems arising out of the District jail that the District caused his constitutional violation. That argument fails as well.

Deliberate indifference exists when "'the municipality knew or should have known of the risk of constitutional violations,' but did not act." *Warren*, 353 F.3d at 39 (quoting *Baker*, 326 F.3d at 1307). This standard "simply means that, [when] faced with actual or constructive knowledge that its agents will probably violate constitutional rights, the city may not adopt a policy of inaction." *Id.* Actual or constructive notice may be shown by demonstrating "[a] pattern of similar constitutional violations[.]" *Connick*, 563 U.S. at 62; *see Harvey v. District of Columbia*, 798 F.3d 1042, 1048, 1053 (D.C. Cir. 2015) (District's persistent failures to reform its policies addressing the medical needs of involuntarily committed mental patients, even after death and serious injuries had resulted, amounted to deliberate indifference to the risk of constitutional violations); *Smith v. District of Columbia*, 413 F.3d 86, 98, 100 (D.C. Cir. 2005) (District found liable for failure to establish safety policies at its homes for delinquent youth because it was deliberately indifferent to the obvious need for "more or different" standards in that setting).

By the same token, deliberate indifference will not be found if the proffered pattern of conduct implicates different

constitutional considerations. For example, in *Robinson v. Pezzat*, 818 F.3d 1, 4 (D.C. Cir. 2016), District police officers shot and killed a plaintiff's dog while searching her home. While the District had shot other dogs in the past, those incidents had occurred in self-defense after the dog attacked the officer. *Id.* at 13. Critically, those prior shootings were lawful, and so could not have put the district on notice of a risk of *unconstitutional* shootings. In other words, to establish a pattern giving rise to deliberate indifference, the other asserted violations must have materially similar legal implications so as to put the municipality on notice of the probability of future constitutional violations.

Hurd failed to make that type of showing. The evidence he points to involving delayed inmate *release* practices could not have put the District on notice of its need to revise its *incarceration* policies for newly discovered unserved sentences.

Hurd nonetheless insists that his case is similar enough, citing to *Daskalea v. District of Columbia*, 227 F.3d 433 (D.C. Cir. 2000). That case is no help to Hurd. In *Daskalea*, we held that the District was deliberately indifferent to a pattern of sexual harassment and assault in its jails. *Id.* at 439, 441. Hurd argues that, under *Daskalea*, different forms of constitutional violations can combine to establish a custom. Hurd Br. 45–46. But that overreads *Daskalea*. In that case, just seven months before the plaintiff's sexual abuse in the District jail, the District had been found liable for similar sexual mistreatment by its correctional officers. *Id.* at 441. The only difference between the two cases was the gender of the prison guards—a fact of no legal moment. *Id.* at 442.

In Hurd's case, by contrast, the character of the constitutional violations and the asserted policies that led to the

constitutional violation are distinct. In *Bynum* and *Barnes*, the delays in release were the result of administratively sluggish release procedures, rather than the purposeful incarceration because of the discovery of a distinct unserved sentence. For Hurd, the problem was not the pace of his release from his weekend detention for marijuana possession, but that he was physically reincarcerated to serve a different sentence for different crimes.

## C

Hurd's last theory of municipal liability fares better. Hurd alleges that the District has an unconstitutional policy requiring that an inmate be incarcerated rather than released, without due process, whenever a District employee discovers a record indicating that a previous sentence was not fully served.

This theory of municipal liability turns on the existence and content of the District's immediate incarceration policy based on record checks by District employees. Importantly, the District does not deny the existence of a policy that led to Hurd's incarceration. The District admits that it (i) employs legal instrument examiners; (ii) tasks them with reviewing the records of inmates prior to their release to identify any basis for additional incarceration; and (iii) forbids employees to release the individual if the examiner finds such a record. District Br. 8–9 (explaining that legal instrument examiners must review several documents and databases to "certify the accuracy of every release").

In its brief to this court, the District agrees that, "[w]hen a court orders an inmate released in a particular case, officials must check all records to determine if there is any other charge or detainer requiring the inmate's detention, and if so, must hold him at the D.C. Jail." District Br. 19. The District also acknowledged that it has a specific "Program Statement" that

requires its legal instrument examiners to review computerized record databases "to determine if there are any outstanding warrants or charges preventing release, prior to an inmate's release from the custody of the [Department of Corrections]." J.A. 269. And before the district court, the District admitted that the legal instrument examiner in Hurd's case had "no other options" but to hold Hurd because of the "unexpired judgment and commitment" from the District of Columbia judge who originally sentenced Hurd. J.A. 618.

Nevertheless, on appeal, the District has tried to portray what happened to Hurd as just an isolated mistake by one legal instrument examiner, arguing that no District policy mandated that Sibert not release Hurd upon discovery of a record indicating the misdemeanor sentences were not served. The District now insists that the written policy statement only requires that inmates be held if there is an outstanding "charge or detainer," and that the policy statement does not address what to do with an unserved sentence. *See* District Br. 19; Transcript of Oral Argument at 32:10–12, *Hurd v. District of Columbia*, No. 20-7003 (District Counsel asserting "there's no policy here governing what happens when you have someone who was erroneously released and that has an unserved portion of their sentence.").

Because the nature and contours of the alleged policy present a number of disputed issues of material fact, the district court erred in granting summary judgment for the District.

First, the District's materially contradictory descriptions of its policy and, in particular, its application to unserved sentences, are unresolved material facts very much disputed by Hurd and critical to determining the constitutionality of the District's policy.

Second, while the District attempts to lay Hurd's

incarceration on the shoulders of an assertedly single wayward legal instrument examiner who denied Hurd release, that argument begs the critical factual question of "then what?" The problem identified by Hurd goes far beyond the initial denial of his release. Hurd contends that he was incarcerated under lock and key for just shy of two years. That incarceration, we can reasonably infer from the record, was the result of a series of determinations undertaken by the Department of Corrections itself, not the product of a single decision made by the legal instrument examiner. For instance, the legal instrument examiner attests that he sought out his supervisor for advice regarding whether to release Hurd, and that the supervisor was the one who ultimately wrote "Denied" on Hurd's release authorization form. *See* J.A. 243–244, 368. Moreover, it was the District's Department of Corrections—not the legal instrument examiner—who subsequently emailed Hurd to inform him that his previous release had been erroneous. J.A. 185. And when Hurd challenged his incarceration without due process, the decision to incarcerate Hurd was defended in court by the District's attorneys, not the legal instrument examiner. *See* District of Columbia Department of Correction's Response Brief at 3, *United States v. Hurd*, No. 2005 FEL 4391 (D.C. Super. Ct. Dec. 21, 2011).[2] So regardless of whether the policy of checking the records alone was lawful, *Hurd*, 427 F. Supp. 3d at 30, the question posed by Hurd's case is how that policy resulted in an incarceration *by the Department of Corrections* for almost two years that was

---

[2] To be clear, we are not holding that a municipality's legal defense of an action taken by its employee in and of itself necessarily leads to the conclusion that an official policy exists under *Monell*. We reference the District's legal defense here to underscore the unresolved factual questions in this case bearing on the nature of the policy and the District's attempt to blame Sibert alone for Hurd's incarceration.

defended in court *by the District*.

Because there are conflicting facts and testimony in the record regarding the authority of the Department of Corrections' legal instrument examiners to detain inmates based on record reviews, as well as concerning when and how the District authorizes formal incarceration based on the findings of a legal instrument examiner, we reverse the grant of summary judgment on Hurd's claim that the District's incarceration policy is unconstitutional. On remand, the relevant nature and operation of the District's policy must be factually resolved and its constitutionality evaluated. *See e.g.*, *Christensen v. Park City Mun. Corp.*, 554 F.3d 1271, 1278–1280 (10th Cir. 2009) (holding if the relevant ordinances were unconstitutional, "whether on their face or as applied" to the plaintiff, the liability would fall on the city).

**IV**

For all of those reasons, we affirm the district court's judgment that Hurd failed to establish a pattern of constitutional violations or to demonstrate deliberate indifference. But we vacate the entry of summary judgment for the District on the claim of an unconstitutional policy, and we remand for further proceedings consistent with this opinion.

*So ordered.*